## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

MICHAEL DRISCOLL,

     Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, a municipal entity;
CHIEF OF POLICE PAUL PAZEN, in his individual capacity,
PATRICK PHELAN, in his individual capacity;
JOHN & JANE DOES 1-10, in their individual capacities.
     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Michael Driscoll, by and through his attorney, E. Milo Schwab of Ascend Counsel, LLC, respectfully alleges for his Complaint and Jury Demand as follows:

## INTRODUCTION

Over the course of eight days in the spring of 2020, the Denver Police Department engaged in a campaign of retribution against protesters who marched and chanted, calling for an end to police brutality and racism. Throughout this incredible showing of civic engagement, Denver police officers repeatedly shot rubber bullets and tear gas canisters at the faces of protesters. Their apparent goal was to inflict maximum pain. Striking at least fifteen people in the head, the Denver Police took the eyes of two individuals. For Michael Driscoll, the price that Denver police officers demanded for his calls for reform was a shattered skull.

## JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs are conferred by 42 U.S.C. § 1988.

2. Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District

## PARTIES

3. Plaintiff Michael Driscoll is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

4. Defendant City and County of Denver is a municipality in the state of Colorado. The Denver Police Department (DPD) is a subdivision of the City and County of Denver.

5. At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Pazen was acting under color of state law in his capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John & Jane Does 1-10 and directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 31, 2020.

6. At all times pertinent to the subject matter of this litigation, Defendant Patrick Phelan was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Phelan was acting under color of state law in his capacity

as Commander of Special Operations for the Denver Police Department. In this role, Defendant Phelan was in direct command of the officers responding to the George Floyd protests. Defendant Phelan was responsible for supervising Defendants John & Jane Does 1-10 and directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 31, 2020.

7.      At all times pertinent to the subject matter of this litigation, Defendants John & Jane Does 1-10 were citizens of the United States and residents of and domiciled in Colorado. At all times pertinent, Defendants John & Jane Does 1-10 were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the DPD.

## FACTUAL ALLEGATIONS

8.      George Floyd was murdered on May 25, 2020.

9.      Minneapolis police officers arrested Mr. Floyd, a 46-year-old Black man, after a convenience store employee called 911 and told the police that Mr. Floyd had bought cigarettes with a counterfeit $20 bill. Those officers pinned Mr. Floyd to the ground. Then one officer, Derek Chauvin, put his knee on Mr. Floyd's neck. He would choke Mr. Floyd for eight minutes and forty-six seconds while Mr. Floyd repeatedly told him that he couldn't breathe; while numerous other officers callously looked on and did absolutely nothing; while bystanders pleaded for Officer Chauvin to stop killing Mr. Floyd; while Officer Chauvin mocked Mr. Floyd. Among Mr. Floyd's final words were "please, please, please, I can't breathe." He would die in the street under the knee of his oppressor.

10.   Mr. Floyd's death was emblematic of the racist system of policing in the United States of America. Officers know that they can violate the law, and constitution, with impunity, and particularly when the victim of their abuse is a person of color. Fellow officers will do nothing more than stand by and watch. And, when someone complains, the police department, police union, and local prosecutors and politicians will circle the wagons in defense of a murderer, simply because he wears a badge and a gun.

11.   Mr. Floyd's murder, and this system, sparked millions of people to gather across this nation, and world, to mourn and to call for reform of our modern policing.

12.   Denver was among the cities where there was a strong reaction to Mr. Floyd's death with thousands taking to the streets in protest.

13.   Mr. Floyd's murder hit home for Denverites because of Denver law enforcement's repeated murder and brutalization of people of color without consequence, and its history of racist policing. In Denver, there has been George Floyd after George Floyd. From Marvin Booker to Michael Marshall, Denver law enforcement officers have murdered with near impunity. The officers who murdered these Black men still patrol the streets and jails of Denver.

14.   Denver's racist policing is borne out by statistics. Denver law enforcement officers disproportionately use force against Black people. While only 10% of Denver's population is Black, 27% of the use of force incidents in Denver are perpetrated against Black people.

15.   Protesters in Denver held signs, and chanted names, relating to this long, sordid history of police brutality against Black men. Protesters called for an end to the racist policing

that Denver has condoned for decades. Those at the protests voiced their disgust with Denver's lawless law enforcement officers.

16.   Denver Police officers responded as counter-protesters – punishing those calling out police violence. Denver Police used the force of the state to retaliate against thousands calling for a more just policing system.

17.   This protest against police brutality was met with the very thing it was protesting.

**Denver Police Targeted Journalists and those Attempting to Record DPD's Violent Behavior During the George Floyd Protests.**

18.   Throughout the Denver George Floyd protests, Denver police officers targeted accredited members of the press along with a multitude of individuals seeking to record police conduct.

19.   Time after time, they shot at individuals recording, seeking to limit the opportunity for those outside the protests to see their actions.

20.   And as we have seen over the past decade, the filming of police officer's using excessive force has played a critical role in building a movement to stem the worst abuses.

21.   On May 28, 2020, while he was covering the protests at the State Capitol, Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me*."*



*Hymoung Chan's arm after being shot*



*Mr. Chan's press badge*

22.     On May 29, 2020, a DPD officer shot Andy Sannier in the chest with a rubber bullet

without warning during the protests. Mr. Sannier was walking home downtown that

evening, when he saw a Black man yelling at, but not threatening, officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

23.     On May 29, 2020, John Cameron attended the George Floyd protests in Denver in order to record footage as a member of the press. When DPD officers noticed him recording, and without warning, officers started firing pepper balls and rubber bullets. He turned and ran and they continued firing at him, hitting him in the back.

24.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times in the chest by rubber bullets fired by DPD officers. Officers also fired paintballs, hitting the front lens of his conspicuous professional-grade video camera, which was at head level when DPD officers fired on him.

25.     On May 30, 2020, Timmy Lomas was attending the Denver George Floyd protests. Mr. Lomas was filming the front line of the protests, in particular, an incident involving a man injured by a flash-bang grenade fired by the Denver Police. While he was filming, another DPD officer pepper-sprayed Mr. Lomas directly in the face. Mr. Lomas had committed no crime, was not resisting arrest, and was threatening no person. He was only filming. That was enough for the Denver police to retaliate against him.

26.     On May 30, 2020, Alexis Mendez was attending the George Floyd protests in downtown Denver. Mr. Mendez wanted to document the protests, so he filmed peaceful

protesters with his phone. While filming, a DPD officer shot Mr. Mendez in the chest with a rubber bullet, causing bruising, which lasted several weeks.



27.    On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round while standing beside a professional cameraman from that station. The round struck Mr. Jojola's backpack.

28.    On May 30, 2020, James Sweetman was recording DPD officers in riot gear firing tear gas, pepper balls, and rubber bullets into a crowd of protesters. Soon, officers ran over to Mr. Sweetman and fired pepper balls at him, striking him in the head and back. This was done in retaliation for his efforts to record their conduct.

29.     On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was standing in a group of press photographers when a law enforcement officer kicked a pepper gas canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked in her face*

30.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with rubber bullets. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen.



*Alex Burness after being shot*

31.     On May 31, 2020, DPD officers shot at Trevor Hughes face with rubber bullets without warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30 p.m. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a rubber bullet. The shot broke and

severed Mr. Hughes's right ring finger, leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes had to have his finger surgically repaired.

32.    On June 2, 2020, DPD officers shot Darrell Hampton in the face without warning. Mr. Hampton was peacefully protesting, and filming DPD officers, on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to randomly shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers.



**Denver Police Responded to Calls for and End to Police Brutality with Overwhelming Use of Force without Any Reasonable Basis**

33.     Over the course of the Denver George Floyd protests, the Denver police exhibited a callous disregard for the First Amendment rights and personal safety of thousands of peaceful protesters.

34.     Thousands of people were subjected to tear gas, pepper balls, pepper spray, and other chemical irritants which cause difficulty in breathing, skin irritation, and severe pain.

35.     Hundreds, if not thousands of protesters were also hit with kinetic impact projectiles.

36.     For the Denver police, calls for reform to policing and demands for accountability were to be met with force. The Denver police did not like the message that the protesters were expressing. It was that simple.

37.     Throughout these days of protests, Defendant Phelan, as Commander of the police response to the protests and Defendant Pazen, as chief of police, were made aware of the gratuitous use of force by their officers. Complaints were made by protesters along with calls from elected officials, imploring that the DPD and its officers stop using such brutality against those seeking change.

38.     DPD has body cameras and overhead videos, called HALO cameras, capturing much of the police violence. There were videos circulating online and being shown to Defendants Phelan and Pazen.

39.     Nonethless, these Defendants took no action to rein in their officers. They knew of the brutality being inflicted and they ratified it each day with their indifference or support.

40.     After eight days of brutal violence inflicted on thousands of protesters and the infliction of fear in many more people who would attended the protests but for fear of

punishment, a District of Colorado Court issued a Temporary Restraining Order on the Denver police which called out their repeated and intentional violations of constitutional rights.

41.     This restraining order imposed common sense restrictions on police use of force – requirements such as a prohibition on aiming for heads and groins, requirements that police issues orders to disperse before using chemical irritants and that protesters be given adequate time to disperse, and that kinetic impact projectiles could not be shot indiscriminately into crowds.

42.     On May 28, 2020, Fernando Garcia attended the George Floyd protests in downtown Denver to express his beliefs on police brutality. During the course of that evening, Mr. Garcia was tear-gassed and shot in the back with rubber bullets and pepper spray. Mr. Garcia's roommate was also shot in the back by DPD officers with a rubber bullet.

43.     On May 28, 2020 Emily Heydt was protesting in Denver when a SWAT truck pulled up to a red light. Without provocation, several officers on the side of the vehicle shot her with pepper balls. When the light turned green, they drove away.

44.     On May 29, 2020 Ellektra Rowland was attending the George Floyd protests in downtown Denver. At about 9:30 p.m. Ms. Rowland was shot in the leg with a tear gas canister by DPD officers. This canister ripped open her jeans and cut her leg. Later that evening, DPD officers shot her in the head with pepper balls.

45.     On May 29, 2020, Christopher Holland was protesting in downtown Denver. He marched, holding a sign above his head. DPD officers then shot Mr. Holland in the wrist with a rubber bullet. Mr. Holland is lucky that it only hit his wrist as his hands

were above his head. It appeared to Mr. Holland that the officers had aimed for his head.

46.   On Friday May 29, 2020, at around 3:45 p.m., Elizabeth Werren was marching in Denver when DPD officers pepper sprayed her directly in the face.

47.   On May 30, 2020, Brianna Barber attended the George Floyd protests in downtown Denver. While in Civic Center Park rendering aid to those who were injured, Ms. Barber noticed a group of DPD officers storm the park, shooting rubber bullets, tear gas canisters, and flash-bang grenades. Ms. Barber raised her hands in a "don't shoot" gesture. DPD officers shot her with a rubber bullet. They also took her protest sign and ripped it up.

48.   On May 30, 2020 Carter Nadolsky attended the George Floyd protest in downtown Denver. Mr. Nadolsky had recently had surgery and was using crutches at the time. While standing in the crowd, Mr. Nadolsky was targeted by a DPD officer and was shot in the stomach with a rubber bullet. Mr. Nadolsky was knocked to the ground as a result of the rubber bullet. While he was on the ground, DPD officers then shot Mr. Nadolsky with pepper balls.

49.   On May 31, 2020 Alexandra Barbour was participating in a peaceful protest in downtown Denver. During the course of the evening, DPD officers shot Ms. Barbour in the right ankle with a rubber bullet. Ms. Barbour suffered serious injuries as a result of this attack.

50.   On May 31, 2020, Jessica Beverage was attending the George Floyd protests in downtown Denver when DPD officers, without provocation, began deploying tear gas

into a crowd of peaceful protesters. Ms. Beverage turned to escape the tear gas, but was instead shot in the back of the head with a tear gas canister.

51.     On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

52.     On June 1, 2020, David Chapman was standing alone on the sidewalk in front of his apartment speaking on the phone. A Denver SWAT vehicle with six officers hanging off the side drove by and as they passed him, one officer shot him in the kidney with a rubber bullet, causing significant pain and causing him to fall to the ground. As he got up, those officers fired a tear gas canister at this lone individual who had committed no crime and threatened no person. The DPD officers drove away.

**Denver Police Officers Repeatedly Intentionally Shot Protesters in the Head**

53.     The most concerning thing about the DPD response to the protests was their willingness to seek the infliction of maximum pain and potential death.Simply put, over and over again, Denver police officers aimed at and shot protesters in the head with rubber bullets.

54.     This is the use of deadly force.

55.     The manufacturers of rubber bullets say so.

56.     Academic and medical studies on the use of rubber bullets say so.

57.     And the Denver police operations manual says so.

58.     Nonetheless, night after night, Denver police took aim and struck protester after protester in the head. They took eyes and cracked skulls.

59.    Defendants Phelan and Pazen were made aware of the injuries to heads and eyes. They were told that protesters were being hit in the head and that people were exhibiting serious injuries at the hands of their subordinate police officers.

60.    They took no action.

61.    On May 28, 2020 Michael Acker was attending the George Floyd protests in Denver was he was struck in the face with a rubber bullet. He had worn a gasmask to protect against the indiscriminate use of tear gas and pepper bullets which DPD had utilized over the week to send the message that protesting police violence was not permitted in Denver. He immediately lost vision in his right eye and when he pulled this gasmask off, blood poured all over his hands, face, and the concrete below him. Had he not been wearing a mask, he likely would have lost his eye.



62.     On May 29, 2020, Gregory Trickel was attending the George Floyd protests in downtown Denver when he was ordered to disperse by Denver Police officers. Mr. Trickel then put his hands in the air to show that he was going to comply with the DPD officers' demands. At this point, DPD officers pointed their rubber bullet launchers at his face and genitals. Mr. Trickel knew that they were aiming for him because he could see the laser guides. One DPD officer then intentionally fired a rubber bullet directly at Mr. Trickel's head from 15 feet, but fortunately this officer had poor aim and missed.

63.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He observed a largely peaceful protest. He witnessed DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was shocked that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls and rubber bullets, and he was tear gassed multiple times. When DPD officers fired rubber bullets at Mr. Thorn, they struck him the head, just as they did countless others during the peaceful protests. Fortunately, Mr. Thorn was wearing a helmet. Mr. Thorn was one of the four Plaintiffs

who sued the City of Denver and obtained a Temporary Restraining Order against the excessive use of force by DPD. Unfortunately for at least a dozen people, the TRO was not entered until Friday, June 5, 2020.

64.    On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a kinetic impact projectile (KIP) while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



65.     On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a DPD truck fired a projectile at his face without warning and blinded him in one eye. Mr. Feldmann was walking from his friend's apartment to his car. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or threw anything at the DPD officers on the truck, which was marked with the DPD logo. Mr. Feldmann didn't see what hit him, but that reached his hand up to his face and felt blood. Jax was shot in the eye by a police officer riding on a police truck. His friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery. However, Mr. Feldmann will never regain his full vision. The surgeon who operated on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a rubber bullet.



*Mr. Felfmann after being shot*

66.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head with

a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read

"No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP.

The force of the KIP knocked him out. As a result of this use of force, Mr. Strong

required several facial reconstructive surgeries to repair broken bones around his eye

and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use

of force by DPD officers. When he was shot, Mr. Strong was simply peacefully

protesting and was not engaging in any violence or property destruction.

 

*Mr. Strong after being shot*

67.     On May 30, 2020, Dan Delany was peacefully protesting in Downtown Denver. Mr.

Delany engaged in chants of "no justice, no peace." He also joined with others in asking

the DPD officers to march with them. Instead, the officers began indiscriminately

shooting rubber bullets, tear gas, and pepper balls into the crowd. He turned and ran,

but one officer shot him with a rubber bullet in the back of the head. He was rendered

unconscious and left bleeding from the head.

68.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face.



*Ms. Epps after being shot*

69.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police. At one point, the Police unnecessarily and overwhelmingly tear-gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it form an opaque cloud. Mr. McDaniel saw a protester crawling out of the cloud on his hands and knees. The protester was choking and could

not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

70.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times. The DPD officers did not give any orders before, during, or after this incident. No one told Mr. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers

began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree.

71.    On May 31, 2020, Gabe Schlough was shot in the face with a KIP by DPD officers without warning. Mr. Slough, an individual with a degree in public health anthropology who also has some medical training and had participated in protests before, attended the protests near the state Capitol with the intention of being there help anyone who was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. The officers were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as getting his with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required 22 stitches to close the wound on his chin. He still experiences pain from this wound and will likely require plastic surgery for it to heal properly.



*Mr. Schlough's chin after being shot*

72.     On May 31, 2020, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and

jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week.



*Mr. Packard after being shot in the head*

73.    On May 31, Alex Wolfson was on his skateboard, observing the protests downtown when he was shot in the eye with a projectile by DPD officers. At the time he was struck, he was committing no crime, violating no law, and threatening officer or other individual. He was simply watching the protest. Nonetheless, DPD officers shot him in the eye. He immediately lost sight in his left eye and was bleeding. He was so distraught that he went over to a DPD officer to ask if he still had his left eye. Wolfson was fortunate that he didn't lose his eye or his eyesight, but he did require laser surgery from an emergency retina specialist to address eyesight problems he sustained as a result of this attack.



*Mr. Wolfson after being shot in the eye*

74.     On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning. As a photographer and freelance journalist, Mr. Cruz wanted to document the protests as well as the police response. Throughout the evening, he documented the protests and police action as a photojournalist. At about 8:00 p.m., he was with protesters in front of the Capitol. The protesters were chanting and peaceful. There were over 100 people present. There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and rubber bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters

on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas. Mr. Cruz encountered a group of 35 protesters at a corner, and they were all younger protesters, including teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and others tried to help him. Some people tried to leave, but DPD officers cornered them and shot pepper balls at them. A white person went up to the DPD officers to ask if they could leave because people wanted to go home. The DPD officer said that they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th Avenue and Lincoln. The DPD officers ran after them. The DPD officers were shooting them with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the garage but discovered that armored vehicles blocked off both ends of the block and there was no exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye.

75.     In the first days of the protests, Nicholas Orlin came downtown to march, chant, and sing in support of the Black Lives Matter movement. On one of those first days of the

protests, Nicholas was shot with a rubber bullet in the eye. He was knocked unconscious and awoke in the hospital. Nicholas sustained several fractures along the base of his eye and suffered significant swelling. He has been told by his doctors that he now has an increased likelihood of developing glaucoma. He also suffers from post-traumatic stress disorder as a result of his attack. "It gives me anxiety when I think about joining protests" he told a Fox31 reporter last year.



*Mr. Orlin after being shot*

76.     On the weekend of May 30-31, Shawn Murphy attended the George Floyd protests. Early in the evening before the beginning of curfew, he found himself caught up in a cloud of tear gas. As he would recount, no one was breaking any laws and many were

attempting to disperse but were caught in clouds of tear gas. At one point, while he was trying to disperse, Murphy was struck in the eye with a rubber bullet. Murphy was wearing swim goggles – something that likely saved his left eye. "The goggles shattered, exploded, but I really think it saved by eye." Murphy required emergency surgery that evening to save his retina. His vision has remained blurry.



*Mr. Murphy after being shot in the eye*

**<u>Michael Driscoll Was Shot in the Head for Protesting Police Brutality</u>**

77.     Spurred on by a national call to confront racism and police brutality, Michael Driscoll drove from Pueblo to Denver to be part of a movement.

78.  For several years, Michael had watched video after video of Colorado police officers killing, often unarmed, civilians.

79.  As was the case for many, the murder of George Floyd moved Michael to raise his voice and become part of the movement to call out police brutality and demand reform.

80.  Over the first several nights of the George Floyd protests, unable to attend, Michael watched the live feeds of the protests broadcast by local news stations.

81.  He watched as the Denver Police respond with brutality and violence to calls for an end to police brutality.

82.  He saw repeated targeting of peaceful protesters by the police - the indiscriminate firing of rubber bullets and tear gas canisters into crowds, that the police were purposefully aiming for heads and groins, and the ways in which it was clear that the police were not seeking to maintain order, but were responding in retaliation because they did not want to change. They wanted to continue to inflict violence and brutality without accountability. They demanded respect above all else and would punish those deemed insufficiently respectful.

83.  But when he saw the news reports, the peaceful protesters were described as rioters. The police officers who acting with brutality were treated with deference and respect.

84.  He decided that more voices were needed and that he needed to lend his body and voice to this important movement for police accountability and police reform.

85.  Michael drove to Denver to be one voice in the crowd – because he recognized that the only way we will see change is for those want change to show up.

86.  He showed up.

87.  Michael drove up on Saturday, May 30, 2020 and participated in marching and chanting all day.

88.  What he saw was alarming.

89.  At one point, he watched as an individual on crutches was assaulted by DPD officers. It may have been Mr. Nadolsky, but it's hard to be sure given DPD's extreme behavior for over a week.

90.  Michael watched as DPD officers pepper sprayed a homeless woman who was simply walking along the sidewalk.

91.  He saw DPD officers target medics trying to give aid to those bloodied and injured by DPD's own brutality.

92.  Nonetheless, he marched, subjecting himself to tear gas and pepper balls.

93.  The Denver Police Department and its officers did not want him out protesting their brutality, so he could not back down in the face of further brutality.

94.  Michael livestreamed as he went to give others who were either scared off by DPD's conduct or otherwise unable to attend the protests an insight into how DPD was treating those demanding reform.

95.  Michael used some of his last dollars to get a hotel room on Saturday night. He wanted to give more than one day of marching and chanting to this movement.

96.  The following afternoon, Sunday, May 31, 2020, Michael again came out to protest.

97.  He marched again. He chanted again. He continued to express his beliefs that policing in this country and here in Colorado was too violent and that it had far too little accountability.

98.    Around 10:00 p.m., Michael marched with a group of approximately one hundred protesters to the intersection of Cherokee and 13th Street.

99.    The protesters were peaceful – mindful even of the officers.

100.   The protesters held signs.



101.   They asked the officers to march with them and to kneel with them.

102.   They even made sure that none of the protesters did anything to provoke the DPD officers – you can hear people saying not to throw any water bottles.

103.   None were thrown.

104.   The protester stood peacefully one (100) yards award from a group of police officers. They chanted "I can't breathe."



105.    As the protesters continued their chant of "I can't breathe," DPD officers decided to

        oblige.

106.    DPD officers began to fire tear gas canisters into this peaceful crowd.

107.    When DPD start inflicting this use of force, not a single person was committing a crime.

108.    Not a single person was destroying property.

109.    No one was threatening or harming an individual, including any police officer.

110.    The crowd, Michael included, were simply standing together, chanting "we can't

        breathe" and "kneel with us."

111.    Nonetheless, the Denver police officers present decided that they had had enough.

112.    They didn't like the protesters' message. They didn't want accountability.

113.    They wanted submission. So they began firing every munition at their disposal. They

        continued to fire tear gas into the crowd. They fired rubber bullets. They fired pepper

        balls.

114. Fearing for his safety, Michael raise a plywood shield he had made for himself.

115. Michael had seen the damage that tear gas canisters and rubber bullets could inflict on people and the willingness of the DPD to fire directly at protesters over the course of his two days at the protests. Like the Denver Police officers and Defendants Phelan and Pazen, he was aware that police had blinded people already.

116. But Michael's shield was also his message – he had written ACAB on it.

117. ACAB was a well-known acronym for "all cops are bastards."

118. Michael's poster faced the police.

119. Within seconds of raising his message-bearing shield, Michael was hit in the face with a rubber bullet by a Denver police officer.

120. He immediately knew it was bad. Pain surged through his head.

121. He knew he had been hit somewhere around his forehead, but he also lost his vision.

122. He pulled off a gas mask he had been wearing and blood gushed from his face.

123. He was disoriented and barely conscious.

124. Immediately, another protester saw the serious damage that the police had done to Michael and pulled him away from the crowd to get him to a medic.

125. The medic was not prepared to deal with the injury Michael had sustained.

126. Michael was bleeding profusely between his eyes and out of his nose.

127. The medic tried to provide Michael some treatment, but the police rushed them and started firing pepper balls.

128. The medic ran and Michael stumbled away.

129. The Denver police had seen that he was badly hurt. Instead of helping, they punished him again for coming out to protest and punished the medic for trying to provide aid.

130.    Michael was severely injured and struggling to think.

131.    He found some bushes and hid for a few minutes until this roving band of police officers looking for protesters to attack had left.

132.    Worried that he would die if he sat in the bushes and longer, Michael stood and began looking for the hospital.

133.    Fortunately, Michael found a stranger to give him a ride to a hospital. He knew his injuries were serious, but he was in too much pain to find his own way to the hospital.

134.    Michael was immediately admitted to Denver Health.

135.    The doctors then informed Michael that he had a frontal sinus anterior table fracture and left superior medial orbital fracture.

136.    Effectively, Michael's skull was collapsed between his eyes with the result that his sinus cavity was destroyed.

137.    The doctors told Michael that his sinus had been shattered. He was told that part of his skull had been reduced to dust. He also had a fractural on his orbital bone around his left eye.



138.    Three days later, Michael would have to undergo surgery to reconstruct his skull. This

included a bone graft from the top of his skull.





139.    In all, Michael would need 53 staples to close his skull.

140.    Michael went to a large protest against police brutality and violence.

141.    He never committed a crime. He never hurt or threatened to hurt anyone.

142.    He simple came with a message and a sign calling for change.

143.    He was, as far too many protesters were, met with police brutality and retaliation.

144.    For the Denver Police and its officers, a challenge to police brutality and a call for police reform is something to be met with violence.

145.    DPD officers were angered by his message because they didn't like being challenged.

146.    So they punished him.

147.    Like at least sizteen other protesters, a Denver Police officer intentionally aimed at Michael's head, and shot a rubber bullet which they knew to be lethal force.

148.    Denver's operations manual instructs that aiming for the head with a rubber bullet is deadly force and should be reserved only for situations likely to lead to serious bodily injury of another.

149.    As with the others, Michael is lucky that he was not killed by this lethal force.

150.    However, Michael will always live with the physical and emotional effects of this brutal attack.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Excessive Force
### (Plaintiff against Defendants)

151.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

152.   Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

153.   Defendants are "persons" under 42 U.S.C. § 1983.

154.   Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

155.   Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

156.   Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

157.   Defendants had no warrant authorizing any seizure of Plaintiff.

158.   Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights and is thereby liable for such failure to intervene.

159.   Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

160.   Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

161.   Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

162.   Defendants recklessly created the situation in which they used force.

163.   Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

164.   At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

165.   Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

166.   Defendant Denver has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

167.   The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Defendant Phelan.

168.   Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

169.   Defendant Denver, Chief Pazen, and Defendant Phelan failed to properly supervise and/or train its officers.

170. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

171. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

172. Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Excessive Force
### (Plaintiff against Defendants)

173. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

174. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

175. Defendants are "persons" under 42 U.S.C. § 1983.

176. Plaintiff had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

177. Defendants did not have, at any time, a legally valid basis to use force against Plaintiff.

178. Defendants' use of force was extremely disproportionate.

179.   Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

180.   Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective.

181.   Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

182.   Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

183.   Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

184.   At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

185.   The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

186.   Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

187.   Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

188.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts

and omissions, described above, Plaintiff suffered injuries, damages, and losses.

189. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

190. Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## First Amendment Violation — Freedom of Speech and Assembly
## (Plaintiff against Defendants)

191. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

192. Defendants, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the DPD at all times relevant to the allegations in this Complaint.

193. Defendants are "persons" under 42 U.S.C. § 1983.

194. Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

195. The actions of Defendants – specifically, the use of excessive force against peaceful protesters – would chill a reasonable person from engaging in activity protected by the First Amendment.

196. Plaintiff's expression was on a matter of public concern and did not violate any law.

197. Plaintiff's expression occurred in a traditional public forum.

198. Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

199. Defendants' actions were not a reasonable time, place, and manner restriction on speech.

200. Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

201. At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

202. Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

203. Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

204. Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

205. The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

206. Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

207.   Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

208.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

209.   Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain, and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

210.   Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## FOURTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## First Amendment Violation — Retaliation
## (Plaintiff against Defendants)

211.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

212.   Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

213.   Defendants are "persons" under 42 U.S.C. § 1983.

214.   Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

215.   The actions of Defendants – specifically, the use of excessive force against peaceful

protesters – would chill a reasonable person from engaging in activity protected by the First Amendment.

216.   Plaintiff's expression was on a matter of public concern and did not violate any law.

217.   Plaintiff's expression occurred in a traditional public forum.

218.   Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to use of physical force, including KIPs and chemical agents.

219.   By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

220.   Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

221.   At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

222.   Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

223.   Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

224.   Defendants stopped Plaintiff from engaging in expressive activity in accordance with

the customs, policies, and practices of Defendant Denver.

225.   Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

226.   Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

227.   The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

228.   Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

229.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

230.   Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

231.   Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Procedural Due Process**
**(Plaintiff against Defendants)**

232.  Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

233.  Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

234.  Defendants are "persons" under 42 U.S.C. § 1983.

235.  The due process rights of Plaintiff were violated when Defendants failed to provide any warning about the deployment of KIPs, to provide an opportunity to disperse, to leave open routes of egress, and to enforce the laws of the City of Denver and State of Colorado in a way that a person of ordinary intelligence could understand and comply with them.

236.  Defendant's use of force during the protests was inflicted based on the unbridled discretion of individual police officers, and was in no way guided by any published law or legal authority that would provide a person of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted and prohibited, or what conduct would result in the use of force.

237.  Denver's customs, policies, and practices relating to the use of force during the protests permitted use of force at the unbridled discretion of an individual police officer, without adequate notice or an adequate opportunity to comply, in a way that does not provide a person of ordinary intelligence with a reasonable opportunity to understand what conduct is permitted and prohibited, and in a way that authorizes and encourages discrimination based on the content of the message of a person engaged in expressive activity.

238.  Plaintiff reasonably fears further violation of the right to due process in the future if he participates in protest activity.

239.  At the time when Defendants violated Plaintiff's due process rights, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or should have known of this clearly established right.

240.  Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

241.  The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan.

242.  Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

243.  Defendants Denver, Chief Pazen, and Commander Phelan failed to properly supervise and/or train its officers.

244.  Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

245.  Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and

anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

246. Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## SIXTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## Fourth Amendment Violation — Failure to Train or Supervise
## (Plaintiff against Defendants Denver, Pazen, and Phelan)

247. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

248. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

249. Defendants are "persons" under 42 U.S.C. § 1983.

250. Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

251. Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

252. Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

253. Defendants Denver, Pazen, and Phalen had an obligation to ensure that their officers were properly trained in responding to First Amendment activity, including criticism of officers, and the use of less lethal munitions.

254. Defendants Denver, Pazen, and Phalen were made aware over the course of several evenings that DPD officers were using less lethal munitions, including rubber bullets,

in a retaliatory manner.

255.  Defendants Denver, Pazen, and Phalen were made aware over the course of several evenings that DPD officers were using less lethal munitions, including rubber bullets, in a dangerous manner, often aiming for heads and seeking to inflict the maximum damage possible on protesters.

256.  Defendants Denver, Pazen, and Phalen had a duty to the citizens of Denver and the protesters to stop the use of excessive and often deadly force against protesters who were not threatening any bodily harm.

257.  Defendants Denver, Pazen, and Phalen failed to train their officers in the use of these less lethal munitions and in how to respond to protest movements.

258.  As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

259.  Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

260.  Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A. All appropriate relief at law and equity;

B. Injunctive relief, including:

  a. Enjoining Defendants from using chemical agents, including pepper spray, against those exercising their rights of free speech and assembly;

  b. Enjoining Defendants from shooting projectiles indiscriminately into crowds of those exercising their rights of free speech and assembly;

  c. Enjoining Defendants from shooting projectiles at protesters unless there is an immediate threat of bodily injury to the protester, or others;

  d. Enjoining Defendants from using force without warning against protesters;

  e. Requiring all Defendant law enforcement officers deployed to police demonstrations must have their body-worn cameras recording at all times, and forbidding officers from intentionally obstructing the camera or recording;

  f. Requiring that all Defendant law enforcement officers deployed to police demonstrations must create a use of force report documenting every single deployment of KIPs, tear gas, or any other less-than-lethal weapon;

  g. Requiring that any and all orders to disperse must only be given when there is imminent danger of harm to persons (not property);

  h. Requiring that any and all orders to disperse must be followed by adequate

time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed.

C.   Declaratory relief and other appropriate equitable relief;

D.   Economic losses on all claims as allowed by law;

E.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.   Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.   Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H.   Pre-and post-judgment interest at the lawful rate; and

I.   Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 25th day of October 2021.

s/ Edward Milo Schwab
Edward Milo Schwab, #47897
Ascend Counsel, LLC
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.co

ATTORNEY FOR PLAINTIFF
