EXHIBIT A

## Copied and Pasted Allegations

| *Driscoll* (filed 2/11/24) | *Abay* (6/23/22) | *Dominick* (9/5/22) |
|---|---|---|
| Defendant Denver engaged in repeated, widespread violations of law, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest, and specifically targeting protestors with their curfew; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19; and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts over several nights and involving many locations | Defendant Denver has engaged in repeated, widespread violations of law, as outlined above, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest, and specifically targeting protestors with their curfew; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19; and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts | Defendant Denver engaged in repeated, widespread violations of law, as outlined above, over the course of several nights in May and June of 2020, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest, and specifically targeting protestors with their curfew; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19; and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts over several nights and |

| | | |
|---|---|---|
| constitute an unlawful custom and policy of violating protest participants' constitutional rights. ¶ 277 | over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights. ¶ 184 | involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights. ¶ 146 |
| Defendant Denver and its final policymakers acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by Defendant Denver not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues. ¶ 278 | Defendant Denver and its final policymakers acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by Defendant Denver not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues. ¶ 206 | Defendant Denver and its final policymakers acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by Defendant Denver not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues. ¶ 186 |
| Moreover, Defendant Denver is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, Defendant Denver was required to ensure that all officers complied with civilians' constitutional rights. ¶ 279 | Moreover, Defendant Denver is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, Defendant Denver was required to ensure that all officers complied with civilians' constitutional rights. ¶ 207 | Moreover, Defendant Denver is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, Defendant Denver was required to ensure that all officers complied with civilians' constitutional rights. ¶ 187 |
| Chief Pazen was fully knowledgeable and apprised of the actions of DPD officers described above and, upon information and belief, was on site on one or more days of | Chief Pazen was fully knowledgeable and apprised of the actions of DPD officers described above and, upon information and belief, was on site on one or more days of | Chief Pazen was fully knowledgeable and apprised of the actions of DPD officers described above and, upon information and belief, was on site on one or more days of |

| | | |
|---|---|---|
| the protest, observing this DPD operation, without repudiating or stopping the actions of DPD officers, thereby ratifying them. ¶ 280 | the protest, observing this DPD operation, without repudiating or stopping the actions of DPD officers, thereby ratifying them. ¶ 208 | the protest, observing this DPD operation, without repudiating or stopping the actions of DPD officers, thereby ratifying them. ¶ 188 |
| DPD operated under the Incident Command System during the protestors. Defendant Phelan was the Incident Commander throughout the protests, and as such, no action was taken during the protests without being directed or authorized by Phelan. ¶ 281 | DPD operated under the Incident Command System during the protestors. Defendant Phelan was the Incident Commander throughout the protests, and as such, no action was taken during the protests without being directed or authorized by Phelan. ¶ 209 | DPD operated under the Incident Command System during the protests. Defendant Phelan was the Incident Commander throughout the protests, and as such, no action was taken during the protests without being directed or authorized by Phelan. ¶ 189 |
| Defendant Denver delegated to Patrick Phelan, as Incident Commander, final decision- and policymaking authority over the protests and the police response to the protests. Phelan was in charge of coordinating the officers in the field and directed when and what kinds of force officers could use on protestors. ¶ 282 | Defendant Denver delegated to Patrick Phelan, as Incident Commander, final decision- and policymaking authority over the protests and the police response to the protests. Phelan was in charge of coordinating the officers in the field and directed when and what kinds of force officers could use on protestors. ¶ 18 | Defendant Denver delegated to Patrick Phelan, as Incident Commander, final decision and policymaking authority over the protests and the police response to the protests. Phelan was in charge of coordinating the officers in the field and directed when and what kinds of force officers could use on protestors. ¶ 208 |
| As Incident Commander, Defendant Phelan was in charge of the officers from the other law enforcement agencies who provided mutual aid. Phelan gave the same direction, guidance, and rules of engagement to the officers from other agencies as he did to DPD officers. ¶ 283 | As Incident Commander, Defendant Phelan was in charge of the officers from the other law enforcement agencies who provided mutual aid. Phelan gave the same direction, guidance, and rules of engagement to the officers from other agencies as he did to DPD officers. ¶ 24 | As Incident Commander, Defendant Phelan was in charge of the officers from the other law enforcement agencies who provided mutual aid. Phelan gave the same direction, guidance, and rules of engagement to the officers from other agencies as he did to DPD officers. ¶ 209 |
| Defendant Denver and Phelan, or his designee, expressly authorized and approved the mutual-aid officers' use of other, more dangerous weapons that DPD does not normally use, including but not limited to shotguns that fire beanbag rounds. ¶ 284 | Defendants Denver and Phelan, or Phelan's designee, expressly authorized and approved the mutual-aid officers' use of other, more dangerous weapons that DPD does not normally use, including but not limited to shotguns that fire beanbag rounds. ¶ 58 | Defendant Denver and Phelan, or his designee, expressly authorized and approved the mutual-aid officers' use of other, more dangerous weapons that DPD does not normally use, including but not limited to shotguns that fire beanbag rounds. ¶ 210 |

| | | |
|---|---|---|
| Defendant Denver was responsible for the actions of the members of its mutual-aid network, including but not limited to the Jefferson County Regional SWAT Team ("JCRS"), the Brighton Police Department ("BPD"), and the Commerce City Police Department ("CCPD"). ¶ **286** | Defendant Denver was responsible for the actions of the members of its mutual-aid network, including but not limited to the Jefferson County Regional SWAT Team ("JCRS") and Aurora Police Department ("APD"). ¶ **25** | |
| Defendant Denver's failure to provide adequate training or policies that were obviously needed constituted deliberate indifference. ¶ **287** | Defendant Denver's failure to provide adequate training or policies that were obviously needed constituted deliberate indifference. ¶ **194** | Defendant Denver and Defendant Phelan's failure to provide adequate training or policies that were obviously needed constituted deliberate indifference. ¶ **176** |
| Under DPD Chief of Police Paul Pazen, the prevailing attitude was that training is not important. ¶ **288** | Under DPD Chief of Police Paul Pazen, the prevailing attitude was that training is not important. ¶ **195** | Under DPD Chief of Police Paul Pazen, the prevailing attitude was that training is not important. ¶ **150** |
| For instance, the DPD and Defendant Denver have been called on numerous times dating back at least to 2011 to investigate its use of PepperBalls and other chemical agents against protestors. ¶ **289** | For instance, the DPD and Defendant Denver have been called on numerous times dating back at least to 2011 to investigate its use of PepperBalls and other chemical agents against protestors. ¶ **196** | For instance, the DPD and Defendant Denver have been called on numerous times dating back at least to 2011 to investigate its use of PepperBalls and other chemical agents against protestors. ¶ **178** |
| Despite receiving notice of the DPD's unconstitutional actions, Defendant Denver and DPD deliberately chose not to conduct any further review of the department's less-than-lethal force policy, despite the patently unlawful way in which PepperBall guns had been used against protestors and against the recommendation of the Office of the Independent Monitor, which described the decision not to examine the incident and the underlying policies as a "missed opportunity." ¶ **292** | Despite receiving notice of the DPD's unconstitutional actions, Defendant Denver and DPD deliberately chose not to conduct any further review of the department's less-than-lethal force policy, despite the patently unlawful way in which PepperBall guns had been used against protestors and against the recommendation of the Office of the Independent Monitor, which described the decision not to examine the incident and the underlying policies as a "missed opportunity." ¶ **198** | |

| | | |
|---|---|---|
| Defendant Denver had a policy, practice, or widespread custom of failing to give dispersal or audible dispersal orders prior to the use of force at protests. ¶ 294 | Defendant Denver had a policy, practice, or widespread custom of failing to give dispersal or audible dispersal orders prior to the use of force at protests. ¶ 185 | Defendant Denver had a policy, practice, or widespread custom of failing to give dispersal or audible dispersal orders prior to the use of force at protests. ¶ 147 |
| Defendant Denver had a policy, practice, or widespread custom of inappropriate and indiscriminate use of "less-lethal" weapons including pepper spray, chemical munitions, explosive devices, 40 mm launchers, PepperBalls, and/or other KIPs. ¶ 296 | Defendant Denver had a policy, practice, or widespread custom of inappropriate and indiscriminate use of "less-lethal" weapons including pepper spray, chemical munitions, explosive devices, 40 mm launchers, PepperBalls, and/or other KIPs. ¶ 186 | Defendant Denver had a policy, practice, or widespread custom of inappropriate and indiscriminate use of "less-lethal" weapons including pepper spray, chemical munitions, explosive devices, 40 mm launchers, PepperBalls, and/or other KIPs during the George Floyd protests. ¶ 148 |
| Defendant Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors. ¶ 300 | Defendant Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors. ¶ 187 | Defendant Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors. ¶ 149 |
| Defendant Denver failed to adopt adequate policies in the constitutional responses to Peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors. ¶ 301 | Defendant Denver failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors. ¶ 192 | Defendant Denver and Defendant Phelan failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors. ¶ 174 |
| Defendant Denver failed to adequately train its officers in the use of "less-lethal" | Defendant Denver failed to adequately train its officers in the use of "less-lethal" | Defendant Denver and Phelan failed to adequately train their officers in the use of "less- |

| | | |
|---|---|---|
| weapons, including 40 mm launchers, PepperBalls, and chemical munitions. The training provided by Defendant Denver was outdated, insufficient, and inconsistent with generally accepted standards and practices. Defendant Denver had knowledge of the importance of training on the proper use of "less- lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference. ¶ 302 | weapons, including 40 mm launchers, PepperBalls, and chemical munitions. The training provided by Defendant Denver was outdated, insufficient, and inconsistent with generally accepted standards and practices. Defendant Denver had knowledge of the importance of training on the proper use of "less-lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference. ¶ 188 | lethal" weapons, including 40 mm launchers, PepperBalls, and chemical munitions. The training provided by Defendant Denver and Defendant Phelan was outdated, insufficient, and inconsistent with generally accepted standards and practices. Defendant Denver and Defendant Phelan had knowledge of the importance of training on the proper use of "less-lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference. ¶ 167 |
| In its report completed after an investigation into the use of force by DPD during the protests, the Office of Independent Monitor concluded that, during the protests, Defendant Denver allowed some DPD officers who were not trained or certified in the use of "less-lethal" weapons to use those weapons against protestors. ¶ 303 | In its report completed after an investigation into the use of force by DPD during the protests, the Office of Independent Monitor concluded that, during the protests, Defendant Denver allowed some DPD officers who were not trained or certified in the use of "less-lethal" weapons to use those weapons against protestors. ¶ 189 | In its report completed after an investigation into the use of force by DPD during the protests, the Office of Independent Monitor concluded that, during the protests, Defendant Denver allowed some DPD officers who were not trained or certified in the use of "less-lethal" weapons to use those weapons against protestors. ¶ 168 |
| Defendant Denver failed to provide any training whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant | Defendant Denver failed to provide any training whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant | Defendant Denver and Defendant Phelan failed to provide any training whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown |

| | | |
|---|---|---|
| Denver's failure to train its officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors. ¶ **309** | Denver's failure to train its officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors. ¶ **190** | into crowds. Defendant Denver and Defendant Phelan's failure to train their officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors. ¶ **169** |
| Defendant Denver failed to adopt any policies whatsoever on the use of flashbang grenades or Stinger grenades. In light of the serious and obvious risk of bodily injury and danger posed by flashbang grenades or Stinger grenades, Denver's failure to provide any policies or training on their use posed an obvious risk of violation of the constitutional rights of protestors. ¶ **310** | Defendant Denver failed to adopt any policies whatsoever on the use of flashbang grenades or Stinger grenades. In light of the serious and obvious risk of bodily injury and danger posed by flashbang grenades or Stinger grenades, Denver's failure to provide any policies or training on their use posed an obvious risk of violation of the constitutional rights of protestors. ¶ **193** | Defendant Denver and Defendant Phelan failed to adopt any policies whatsoever on the use of flashbang grenades or Stinger grenades. In light of the serious and obvious risk of bodily injury and danger posed by flashbang grenades or Stinger grenades, Denver's failure to provide any policies or training on their use posed an obvious risk of violation of the constitutional rights of protestors. ¶ **175** |
| Defendant Denver failed to provide any training to the law enforcement officers from outside agencies and did not conduct any joint training exercises with the outside agencies, which was necessary in order to ensure that outside law enforcement officers would not violate the constitutional rights of citizens in Denver. ¶ **314** | Defendant Denver failed to provide any training to the law enforcement officers from outside agencies and did not conduct any joint training exercises with the outside agencies, which was necessary in order to ensure that outside law enforcement officers would not violate the constitutional rights of citizens in Denver. ¶ **191** | Defendant Denver and Defendant Phelan failed to provide any training to the law enforcement officers from outside agencies and did not conduct any joint training exercises with the outside agencies, which was necessary in order to ensure that outside law enforcement officers would not violate the constitutional rights of citizens in Denver. ¶ **173** |
| Defendant Denver's policy was to allow the law enforcement officers from outside jurisdictions providing mutual aid to follow their own use of force policies and use their own weapons, even if their own weapons were not approved for use by DPD officers. ¶ **315** | Defendant Denver's policy was to allow the law enforcement officers from outside jurisdictions providing mutual aid to follow their own use of force policies and use their own weapons, even if their own weapons were not approved for use by DPD officers. ¶ **202** | Defendant Denver's policy was to allow law enforcement officers from outside jurisdictions providing mutual aid to follow their own use of force policies and use their own weapons, even if their own weapons were not approved for use by DPD officers. ¶ **182** |
| The use of force policies of JCRS were "in line with DPD's Use of Force Policy." | The use of force policies of JCRS were "in line with DPD's Use of Force Policy." | The use of force policies of JCRS were "in line with DPD's Use of Force Policy." |

| ¶ 317 | ¶ 203 | ¶ 183 |
|---|---|---|
| Additionally, Defendant Denver approved and "verified" the use of the "less-lethal" weapons used by JCRS, including beanbag shotguns, Arwen rubber ball grenades, and Stinger grenades. ¶ 318 | Additionally, Defendant Denver approved and "verified" the use of the "less-lethal" weapons used by JCRS, including beanbag shotguns, Arwen rubber ball grenades, and Stinger grenades. ¶ 205 | Additionally, Defendant Denver approved and "verified" the use of the "less-lethal" weapons used by JCRS, including beanbag shotguns, Arwen rubber ball grenades, and Stinger grenades. ¶ 185 |
| Defendant Denver's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiff's constitutional rights. ¶ 319 | Defendant Denver's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiff's constitutional rights. ¶ 200 | Defendant Denver's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiffs' constitutional rights. ¶ 180 |
| These violations are also a direct result of Defendant Denver's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests. ¶ 320 | These violations are also a direct result of Defendant Denver's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests. ¶ 201 | These violations are also a direct result of Defendant Denver's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests. ¶ 181 |
| In addition, Defendant Denver's policy at the time of the protests was that officers were not required to complete use of force reports after using "less-lethal" weapons at a protest. During the protests, DPD officers believed that they were not required to complete use of force reports accounting for their use of force against civilians. It was not until weeks later, after a lawsuit was filed against the DPD in Abay v. City and County of Denver, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use of force reports | In addition, Defendant Denver's policy at the time of the protests was that officers were not required to complete use of force reports after using "less-lethal" weapons at a protest. During the protests, DPD officers believed that they were not required to complete use of force reports accounting for their use of force against civilians. It was not until weeks later, after a lawsuit was filed against the DPD in Abay v. City and County of Denver, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use of force reports | In addition, Defendant Denver's policy at the time of the protests was that officers were not required to complete use of force reports after using "less-lethal" weapons at a protest. During the protests, DPD officers believed that they were not required to complete use of force reports accounting for their use of force against civilians. It was not until weeks later, after a lawsuit was filed against the DPD in Abay v. City and County of Denver, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use of force reports |

| | | |
|---|---|---|
| documenting their use of "less-lethal" weapons. ¶ **321** | documenting their use of "less-lethal" weapons. ¶ **217** | documenting their use of "less-lethal" weapons. ¶ **197** |
| Defendant Denver knew and understood, prior to the protests, that timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual, which sets forth detailed use-of-force reporting requirements during day-to-day policework. Despite this, Defendant Denver inexplicably applied a different policy to protests. ¶ **322** | Defendant Denver knew and understood, prior to the protests, that timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual, which sets forth detailed use-of force reporting requirements during day-to-day policework. Despite this, Defendant Denver inexplicably applied a different policy to protests. ¶ **218** | Defendant Denver knew and understood, prior to the protests, that timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual, which sets forth detailed use-of-force reporting requirements during day-to-day police work. Despite this, Defendant Denver inexplicably applied a different policy to protests. ¶ **198** |
| Defendant Denver's failure to require timely use-of-force reporting allowed DPD officers to escape accountability for use of excessive force during the protests. Officers were aware during the protests that they would not have to account for their use of force, and they were not required to write use of force reports or officer statements after the fact until weeks later, when their memories of the events were no longer fresh. ¶ **323** | Defendant Denver's failure to require timely use-of-force reporting allowed DPD officers to escape accountability for use of excessive force during the protests. Officers were aware during the protests that they would not have to account for their use of force, and they were not required to write use of force reports or officer statements after the fact until weeks later, when their memories of the events were no longer fresh. ¶ **219** | Defendant Denver's failure to require timely use-of-force reporting allowed DPD officers to escape accountability for use of excessive force during the protests. Officers were aware during the protests that they would not have to account for their use of force, and they were not required to write use of force reports or officer statements after the fact until weeks later, when their memories of the events were no longer fresh. ¶ **199** |
| Defendant Denver did not have a written policy that specifically governed the use of body-worn cameras ("BWC") during the protests. In fact, DPD's policy and practice was that officers were not required to activate their BWC during the protests. As a result, many officers did not | Defendant Denver did not have a written policy that specifically governed the use of body-worn cameras ("BWC") during the protests. In fact, DPD's policy and practice was that officers were not required to activate their BWC during the protests. As a result, many officers did not | Defendant Denver did not have a written policy that specifically governed the use of body-worn cameras ("BWC") during the protests. In fact, DPD's policy and practice was that officers were not required to activate their BWC during the protests. As a result, many officers did not |

| | | |
|---|---|---|
| activate their BWC, including during events when officers used excessive force on protestors, including Plaintiffs. ¶ 324 | activate their BWC, including during events when officers used excessive force on protestors, including Plaintiff. ¶ 220 | activate their BWC, including during events when officers used excessive force on protestors, including Plaintiffs. ¶ 200 |
| Moreover, on May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised DPD officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less- lethal" weapons against protestors was proper. ¶ 325 | Moreover, on May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised DPD officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less-lethal" weapons against protestors was proper. ¶ 210 | Moreover, on May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised DPD officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less-lethal" weapons against protestors was proper. ¶ 190 |
| Defendant Denver's final policymakers received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press. ¶ 326 | Defendant Denver's final policymakers received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press. ¶ 215 | Defendant Denver's final policymakers received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press. ¶ 195 |
| The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were approved by the DPD Internal Affairs Bureau. ¶ 336 | The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were approved by the DPD Internal Affairs Bureau. ¶ 211 | The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were approved by the DPD Internal Affairs Bureau. ¶ 191 |
| Defendant Phelan authorized the use of chemical munitions and "less-lethal" weapons on protestors between 5:30 and 8:00 p.m. in and around Colfax and Lincoln, Colfax and Broadway, and the area of the Capitol on May 30, 2020. ¶ 338 | Defendant Phelan authorized the use of chemical munitions and "less-lethal" weapons on protestors between approximately 6:00 and 8:00 p.m. in and around Colfax and Lincoln, Colfax and Broadway, and the area of the Capitol on May 30, 2020. ¶ 110 | Defendant Phelan authorized the use of chemical munitions and "less-lethal" weapons on protestors between 5:30 and 8:00 p.m. in and around Colfax and Lincoln, Colfax and Broadway, and the area of the Capitol on May 30, 2020. ¶ 231 |