**Recast Allegations**

| *Driscoll* (filed 2/11/24) | *Abay* (6/23/22) | *Dominick* (9/5/22) |
|---|---|---|
| JCRS officers, as with all officers providing mutual aid during the protest, acted under the command and at the direction of Defendant Phelan. ¶ 285 | Between approximately 9:30 to 9:45 p.m., Schneider marched with hundreds of others in front of the Basilica on Colfax between Pennsylvania and Logan. She was stopped by a line of Aurora police and JCRS officers that had formed a skirmish line on Pennsylvania, at the direction of Defendant Phelan. ¶ 114<br><br>As hundreds of protestors gathered in the block of Colfax between Logan and Pennsylvania, a contingent of DPD officers, led by Lt. Williams, formed a line with their bodies and vehicles from the west, at Logan. This, too, was done at the direction of Defendant Phelan. ¶ 115 | |
| On October 29, 2011, Denver police officers responded to a peaceful protest by indiscriminately shooting protesters with KIPs, including pepper balls. Denver police officers fired a number of these rounds at people who were lawfully dispersing. Not only did Denver police officers shoot KIPs, including pepper balls, indiscriminately into the crowd of peaceful protesters, but they also routinely targeted individuals' faces. For example, Denver police officers shot Philip Becerra in the face with a pepper ball. Mr. Becerra suffered facial injuries on the bridge of his nose, less than an | After Denver police fired PepperBalls at peaceful protestors on October 29th, 2011 during the Occupy Denver demonstrations in Civic Center Park, Defendant Denver received several complaints and conducted an internal debriefing. ¶ 197 | In the fall of 2011, the Denver Police targeted Occupy protesters, arresting dozens and deploying pepper balls in response to peaceful protests. Many of those demonstrators would continue to protest Denver Police violence and the treatment of the homeless for the years to come. Responding to these protesters, Denver police selectively enforced municipal statutes, used chemical and kinetic munitions and batons on peaceful protesters. As part of their use of force, Denver police officers shot pepperballs indiscriminately into protest crowds and aimed at protesters when they ran away. Denver police |

| | | |
|---|---|---|
| inch from his left eye. Mr. Becerra could have easily been blinded in that eye, or even killed, by this indiscriminate use of force. ¶ 290 | | officers aimed at protesters' heads, including Phillip Becerra who was shot between the eyes with a pepper ball. ¶ 137 |
| DPD's policy regarding whether a verbal warning or dispersal order was necessary before the use of force on a crowd was to grants its officer essentially unlimited discretion. ¶ 295 | No warnings, orders (including dispersal orders), or announcements were made prior to the use of force. ¶ 85 | Defendant Denver had a policy, practice, or widespread custom of failing to give dispersal or audible dispersal orders prior to the use of force at protests. No orders were given prior to using indiscriminate and disproportionate force on protesters during the George Floyd protests. ¶ 147 |
| DPD indiscriminately and inappropriately used chemical munitions such as tear gas. There was no attempt to isolate non-peaceful from peaceful protesters. Tear gas was also frequently thrown into the middle of a crowd, which made it difficult for protestors to determine where to go, especially if they were faced with a line of officers on one side and tear gas on the other side. ¶ 297 | Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech. DPD and its mutual-aid officers accomplished this by forming police lines around protesters. They also kettled protestors before using "less-lethal" weapons on them such as tear gassing, pepper spraying, throwing flashbangs, and shooting rubber bullets at them. ¶ 63<br><br>One tactic used by DPD and its mutual-aid officers during the protests was to chase nonviolent protesters into alleys, trap them, and then shoot chemical weapons such as tear gas or pepper spray at them, and/or flashbang grenades. ¶ 64 | There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and rubber bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape. ¶¶ **129,** *passim*. |
| Throughout the GFP, DPD officers used chemical agents and less-lethal munitions against peaceful members of the crowd during the GFP. It was so prevalent that almost each DPD officer used such | Defendant Denver has engaged in repeated, widespread violations of law, as outlined above, over the course of several nights, shutting down the exercise | Defendant Denver engaged in repeated, widespread violations of law, as outlined above, over the course of several nights in May and June of 2020, shutting down the |

| | | |
|---|---|---|
| force on peaceful protesters at various times during the GFP and thousands of peaceful protesters were subjected to such force. Such collective punishment laid bare the degree to which this custom operated as the standard operating procedure during the GFP. ¶ **298** | of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest, and specifically targeting protestors with their curfew; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19;1 and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights. ¶ **184** | exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest, and specifically targeting protestors with their curfew; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19; and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights. ¶ **146** |
| Chemical agents such as tear gas are indiscriminate weapons which affect peaceful | On this day, and throughout the protests, DPD policy required use of | Throughout the protests, DPD policy required use of chemical munitions, including tear gas, |

| | | |
|---|---|---|
| and non-peaceful protestors alike. This—in addition to the fact that tear gas is a serious level of force—is one of the reasons that its use must be authorized by command staff and during the GFP, it was frequently authorized by Commander Phelan himself. ¶ **299** | chemical munitions, including tear gas, to be authorized by the Command Post (that is, Incident Commander Defendant Phelan), unless there were exigent circumstances, in which case a command-level officer at the scene could authorize the use of chemical munitions. ¶ **104** | to be authorized by the Command Post (that is, Incident Commander Defendant Phelan), unless there were exigent circumstances, in which case a command-level officer at the scene could authorize the use of chemical munitions. ¶ **211** |
| The DPD Crowd Management Manual does not contain any discussion of use of flashbangs, Stinger grenades or other explosive devices. There is no policy on NFDDs or other explosives or their use nor are DPD officers trained on their use. Nonetheless, officers, including several Defendants, used NFDDs on Mr. Driscoll. NFDDs can cause serious injuries, including permanent hearing loss and severe burns. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Only officers who are specially trained in their use should use them. ¶ **308** | Defendant Denver failed to provide any training whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant Denver's failure to train its officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors. ¶ **190** | Defendant Denver and Defendant Phelan failed to provide any training whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant Denver and Defendant Phelan's failure to train their officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors. ¶ **169** |
| DPD and other police agencies present at the GFP in Denver relied on indiscriminate impact munitions during the GFP, including Rubber Ball Grenades and Sting-Ball Grenades even though they were not trained to use these on crowds. These grenades are thrown by hand and they project rubber balls or pellets for approximately a 50-foot | In its report completed after an investigation into the use of force by DPD during the protests, the Office of Independent Monitor concluded that, during the protests, Defendant Denver allowed some DPD officers who were not trained or certified in the use of "less-lethal" weapons to use those weapons against protestors. ¶ **189** | |

| | | |
|---|---|---|
| radius. Because the projectiles cannot be aimed, they place crowd members at risk for serious injury or death, with a particularly high risk of eye injuries. ¶ **311** | Defendant Denver failed to provide any training whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant Denver's failure to train its officers on the use of flashbang grenades and Stinger grenades directly caused injury to protestors. ¶ **190** | |
| DPD did not rely sufficiently on crowd management strategies during the GFP to reduce tensions and prevent conflict. Part of the reason for this is that the DPD provided the officers or their supervisors with no training on how to enact the practices described in the Crowd Management Manual. Instead, the DPD relied primarily on the use of crowd control tactics. The DPD also did not follow nationally accepted standards or its own policies regarding warnings and dispersal orders before using less-lethal force against crowds. ¶ **313** | Although the protests were overwhelmingly peaceful, the Denver Police Department ("DPD") and officers from other agencies in DPD's mutual-aid network used violent crowd control tactics against these peaceful protestors. Over the course of several days, the DPD and its mutual-aid officers deployed constitutionally unlawful crowd control tactics, including kettling, indiscriminate and unwarned launching of tear gas and flashbangs into crowds and at individuals, and shooting projectiles at protestors. These protestors included many young Black and brown people. ¶ **2** | During the protests, the DPD and its mutual-aid officers employed violent crowd control tactics to corral, intimidate, and suppress the speech of protestors. ¶ **29** |
| When a law enforcement agency mobilizes other law enforcement agencies to | Defendant Denver was responsible for the actions of the members of its | |

| | | |
|---|---|---|
| provide mutual aid, it is responsible for structuring and guiding the actions of officers from those agencies. Those officers must be provided with a clear sense of mission. ¶ **316** | mutual-aid network, including but not limited to the Jefferson County Regional SWAT Team ("JCRS") and Aurora Police Department ("APD"). ¶ **25** <br><br> Moreover, Defendant Denver is responsible for the actions of any non- DPD officers whose services were used during the protests. By using those services, Defendant Denver was required to ensure that all officers complied with civilians' constitutional rights. ¶ **207** <br><br> Defendant Denver was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD. ¶ **19** | |
| DPD Captain Sylvia Sich was also interviewed by Denver's Independent Monitor Nick Mitchell. During that interview, Captain Sich told Mr. Mitchell that she believed that a lot of the protesters were injured by DPD officers due to a lack of supervision provided to the DPD officers by command staff, including Defendant Pazen. ¶ **331** | Defendant Denver failed to adequately supervise its officers, as observed by DPD Captain Sylvia Sich in her interview with the Office of Independent Monitor after the 2020 protests. ¶ **222** | Defendant Denver failed to adequately supervise its officers, as observed by DPD Captain Sylvia Sich in her interview with the Office of Independent Monitor after the 2020 protests. ¶ **202** |
| Nearly four years later, only one officer present at the George Floyd protests has been disciplined for use of force. As DPD command has stated, if an officer uses force and is not subject to | Of the approximately 123 citizen complaints regarding officer use of excessive force during the protests, Defendant Denver disciplined only three officers and fired one probationary officer. ¶ **216** | Of the approximately 123 citizen complaints regarding officer use of excessive force during the protests, Defendant Denver disciplined only three officers and fired one probationary officer. ¶ **196** |

| | | |
|---|---|---|
| disciplinary action, then his or her actions are consistent with DPD policy. Accordingly, each and every instance of force used throughout he GFP, with one exception not related to Mr. Driscoll nor any of the individuals discussed in this compliant, were consistent with DPD policy. ¶ **337** | The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were deemed by DPD's final policymakers to be consistent with DPD policy, practice, and custom. ¶ **212** | The actions of and use of force by DPD officers and those of mutual-aid officers during the protests were deemed by DPD's final policymakers to be consistent with DPD policy, practice, and custom. ¶ **192** |