IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02866-PAB-NRN

MICHAEL DRISCOLL,

     Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, a municipal entity,
PAUL PAZEN, Chief of Police, in his individual capacity,
PATRICK PHELAN, in his individual capacity,
RICK EBERHARTER, in his individual capacity,
TIMOTHY HYATT, in his individual capacity, and
CHRISTOPHER COCHRAN, in his individual capacity,

     Defendants.

---

## ORDER

---

This case arises out of protests against police brutality that occurred in the spring of 2020 in Denver, Colorado in response to the murder of George Floyd ("the protests"). Docket No. 94 at 4–6, 34, ¶¶ 14–21, 83.  The matters before the Court are the Motion to Dismiss Second Amended Complaint on Behalf of Denver, Chief Pazen, and Commander Phelan [Docket No. 99], Motion to Dismiss Plaintiff's Second Amended Complaint [Docket No. 100], filed by defendants Rick Eberharter and Christopher Cochran, and Defendant Timothy Hyatt's Motion to Dismiss Plaintiff's Second Amended Complaint [Docket No. 102].  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.   BACKGROUND

### A.   Factual Background[1]

On May 30, 2020, plaintiff Michael Driscoll drove from Pueblo, Colorado to Denver to participate in the protests.  Docket No. 94 at 34–35, ¶¶ 83, 93.  At approximately 7:30 p.m., Mr. Driscoll was standing on the sidewalk on the southwest corner of Lincoln Street and Colfax Avenue at the Capitol Complex.  *Id.* at 35, ¶ 103. Mr. Driscoll was in a small crowd, chanting and objecting to the use of force against peaceful demonstrators.  *Id.* at 36, ¶ 104.  Neither Mr. Driscoll nor any individual near him was engaged in any crime, was a threat to any individual, or was engaged in any property damage.  *Id.*, ¶ 105.  At approximately 7:33 p.m., defendant Rick Eberharter, a corporal from the Denver SWAT team, threw a tear gas canister at Mr. Driscoll.  *Id.*, ¶ 109.  The tear gas canister landed at Mr. Driscoll's feet.  *Id.* at 37, ¶ 110.  Officer Eberharter had no reason to believe Mr. Driscoll had committed any crime.  *Id.* at 38, ¶ 111.  The tear gas caused Mr. Driscoll severe pain and forced him to stop his protesting momentarily.  *Id.*, ¶ 113.  Officer Eberharter never engaged his body-worn camera and did not complete a use-of-force report or any after-action report for throwing a tear gas canister at Mr. Driscoll.  *Id.*, ¶¶ 116, 119.  Under Officer Eberharter's leadership, no body-worn camera videos for the Denver SWAT team were created, and no reports were created, in spite of their many uses of force.  *Id.* at 39, ¶ 129.  These actions were taken to conceal the identities of the officers engaging in unconstitutional conduct.  *Id.*, ¶ 131.

---

[1] The facts below are taken from plaintiff's second amended complaint, Docket No. 94, and are presumed to be true, unless otherwise noted, for purposes of ruling on the motions to dismiss.

On May 31, 2020, at around 9:09 p.m., Mr. Driscoll was standing on Colfax Avenue between Washington Street and Clarkson Street. *Id.* at 44, 53, ¶¶ 139, 166. Denver Police had formed a line to confront several protesters. *Id.* at 53, ¶ 167. Defendant Timothy Hyatt, a Denver Police Officer, threw a rubber sting-ball grenade at Mr. Driscoll because of a sign Mr. Driscoll was carrying. *Id.*, ¶ 168. The grenade exploded on Mr. Driscoll's sign, which he was using as a shield. *Id.*, ¶ 169. Officer Hyatt later produced a use-of-force report on this incident. *Id.* at 55, ¶ 173. In his report, Officer Hyatt stated that he deployed pepper balls at an individual with a large piece of plywood. *Id.*, ¶ 175. Officer Hyatt stated that the individual with the plywood threw rocks at officers. *Id.*, ¶ 176. At that time, Mr. Driscoll was the only individual with a plywood sign and did not throw rocks at officers. *Id.*, ¶ 177.

Moments after Officer Hyatt threw the rubber sting-ball grenade at Mr. Driscoll, defendant Christopher Cochran, a Denver Police Officer, aimed and fired a 40mm kinetic impact projectile ("KIP"), which hit and broke Mr. Driscoll's plywood sign. *Id.* at 55–56, ¶¶ 181–82. The officers cheered at Officer Cochran's actions, and Officer Cochran stated, "that was awesome." *Id.* at 56, ¶¶ 182–83. During the protests, Officer Cochran never turned on his body-worn camera and never completed a use-of-force report. *Id.*, ¶¶ 186–88. Throughout this interaction with police, Mr. Driscoll committed no crime, was never subject to arrest, was a threat to no person, and was a threat to no property. *Id.* at 55–56, ¶¶ 171, 184.

At around 10:00 p.m., Mr. Driscoll marched with a group of approximately one hundred protesters to the intersection of Cherokee Street and 13th Avenue. *Id.* at 57, ¶ 194. The protesters stood peacefully one hundred yards away from a group of police

officers and chanted "I can't breathe."  *Id.* at 58, ¶ 200.  Denver Police fired tear gas

canisters, rubber bullets, and pepper balls into the crowd of peaceful protesters.  *Id.* at

59–60, ¶¶ 202, 209.  At that time, no member of the group of protesters, including Mr.

Driscoll, was committing a crime, destroying property, or threatening or harming an

individual.  *Id.* at 59, ¶¶ 203–05.  Mr. Driscoll raised his plywood sign to use as a shield.

*Id.* at 60, ¶ 210.  Mr. Driscoll's sign, which displayed the acronym "ACAB,"[2] faced the

police.  *Id.*, ¶¶ 212, 214.  Within seconds of raising his sign, Mr. Driscoll was hit in the

face with a rubber bullet by a Denver police officer.  *Id.*, ¶ 215.

Mr. Driscoll was taken to the hospital, *id.* at 61, ¶ 229, where he was diagnosed

as having a frontal sinus anterior table fracture and a left superior medial orbital

fracture.  *Id.*, ¶ 231.  Mr. Driscoll's skull had collapsed between his eyes, destroying his

sinus cavity.  *Id.*, ¶ 232.  Mr. Driscoll underwent reconstructive surgery for his skull,

which included a bone graft from the top of his skull.  *Id.* at 62, ¶ 234.

During all times pertinent to this litigation, defendant Paul Pazen was the Denver

Chief of Police.  *Id.* at 2–3, ¶ 5.  Chief Pazen was responsible for supervising

defendants Hyatt, Eberharter, and Cochran, as well as all Denver police officers and

mutual aid partner officers responding to the George Floyd protests.  *Id.*  He was

responsible for directing their actions during the protests in response to the murder of

George Floyd and, specifically, their actions during the protest on May 31, 2020.  *Id.*

During all times pertinent to this litigation, defendant Patrick Phelan was the

Commander of Special Operations for the Denver Police Department.  *Id.* at 3, ¶ 6.  In

---

[2] "ACAB" is an acronym for the phrase "all cops are bastards."  Docket No. 94 at
60, ¶ 213.

this role, Commander Phelan was in direct command of the officers responding to the George Floyd protests.  *Id.*  He was responsible for supervising defendants Hyatt, Eberharter, and Cochran, as well as all Denver police officers and mutual aid partner officers responding to the George Floyd Protests.  *Id.*  He was responsible for directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 31, 2020.  *Id.*  Throughout the days of protests, Commander Phelan and Chief Pazen were made aware of the gratuitous use of force by their officers.  *Id.* at 14, ¶ 43.  Complaints were made by protesters, along with calls from elected officials, asking that the Denver Police Department and its officers stop using such force against the protesters.  *Id.*  The Denver Police Department had body cameras and overhead videos, called HALO cameras, that captured much of the police use of force, which was shown to Commander Phelan and Chief Pazen and circulated online.  *Id.*, ¶ 44.  Commander Phelan and Chief Pazen took no action to change the force used by their officers.  *Id.*, ¶ 45.  Commander Phelan and Chief Pazen were made aware of the injuries to the heads and eyes of protesters.[3]  *Id.* at 18, 60, ¶¶ 65, 211.

---

[3] The second amended complaint contains allegations of actions taken by police officers Michael Erickson, Docket No. 94 at 45, 48, ¶¶ 150, 156; Kyle Janosko, *id.* at 47, ¶¶ 153–55; Matthew Domenico, *id.* at 50, ¶ 158; and David Adams, *id.* at 51, ¶ 159.  Mr. Driscoll has settled his claims against these defendants.  Docket No. 157.

### B. Procedural History

Mr. Driscoll filed his original complaint on October 25, 2021.  Docket No. 1.  In the original complaint, Mr. Driscoll brought five claims of relief against the City and County of Denver ("Denver"), Chief Pazen, Commander Phelan, and ten John Doe defendants.  *Id.* at 39–51, ¶¶ 151–260.  These claims include a Fourth Amendment claim for excessive force, a Fourteenth Amendment claim for excessive force, a First Amendment claim for violating Mr. Driscoll's rights of free speech and assembly, a First Amendment retaliation claim, and a Fourteenth Amendment due process claim.  *Id.* These claims were premised on the 10:00 p.m. incident on March 31, 2020, where Mr. Driscoll was shot in the forehead with a rubber bullet.  *See id.* at 32–38, ¶¶ 98–139.

On January 6, 2023, Mr. Driscoll filed a motion to amend his complaint to add eight individual defendants and to add various other allegations, including those allegations relating to Officers Hyatt, Eberharter, and Cochran.  Docket No. 29; *see also* Docket No. 29-1.  Defendants Pazen, Phelan, and Denver opposed Mr. Driscoll's motion to amend his complaint on the grounds that (1) Mr. Driscoll failed to demonstrate good cause to amend his complaint, (2) the new allegations in Mr. Driscoll's amended complaint do not relate back to his original complaint, and (3) Mr. Driscoll's proposed amendments were futile because the additional claims he sought to add are barred by the applicable statute of limitations.  Docket No. 34 at 8–15.  The Court referred the motion to Magistrate Judge Reid Neureiter.  Docket No. 30.  Judge Neureiter issued an order granting Mr. Driscoll's motion to amend the complaint on February 28, 2023. Docket No. 39.

That same day, Mr. Driscoll filed his first amended complaint.  Docket No. 40. The amended complaint brings the same five claims for relief as the initial complaint.

*See id.* at 68–79, ¶¶ 283–378.  However, Mr. Driscoll's amended complaint substitutes the ten John Doe defendants for various officers, including Officers Hyatt, Eberharter, and Cochran.  *Id.* at 1.  Additionally, the complaint adds factual allegations regarding Mr. Driscoll's interactions with police, including the interaction on March 30, 2020 and the 9:00 p.m. interaction on March 31, 2020.  *See id.* at 34–58, ¶¶ 84–199.  The amended complaint adds a sixth claim for relief, namely, a Fourth Amendment failure to train or supervise claim against Denver, Chief Pazen, and Commander Phelan.  *Id.* at 79–81, ¶¶ 379–92.

On March 14, 2023, defendants objected to Judge Neureiter's order granting Mr. Driscoll leave to amend his complaint on the grounds that (1) "Plaintiff lacked good cause to amend the scheduling order out of time under Fed. R. Civ. P. 16(b)(4)," (2) "the two-year statute of limitations bars Plaintiff from amending the Initial Complaint to add the New Defendants, particularly in the absence of any notice upon them, or mistake," and (3) "[e]quitable tolling also does not cure the futility of this amendment, given Plaintiff has been aware of these alleged harms for well over two and a half years and had ample opportunity to conduct discovery but did not do so."  Docket No. 42 at 2.

On October 23, 2023, Mr. Driscoll filed his second amended complaint, which is virtually identical to the first amended complaint.  Docket No. 94.  The filing of the second amended complaint mooted defendants' then-pending motions to dismiss. Docket No. 93 at 2.  Officers Hyatt, Eberharter, and Cochran filed motions to dismiss Mr. Driscoll's second amended complaint on November 6, 2023, Docket No. 100, and November 13, 2023.  Docket No. 102.

Although Officers Hyatt, Eberharter, and Cochran bring motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Docket No. 100 at 2; Docket No. 102 at 2, the motions to dismiss include defendants' arguments regarding their objections to Judge Neureiter's order granting Mr. Driscoll leave to file the first amended complaint, which Docket No. 93 authorized defendants to do.  Thus, the Court will consider *de novo* the statute of limitation issues, regardless of the fact that Judge Neureiter ruled on some or all of these issues in Docket No. 39.  This review will consider whether it was proper to allow Mr. Driscoll to amend the complaint to add claims against Officers Hyatt, Eberharter, and Cochran.  However, as to issues other than the statute of limitations and amendment of the complaint, the Court will apply a Rule 12(b)(6) analysis.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th

Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

III. **ANALYSIS**

A. **Motions to Dismiss by Defendants Hyatt, Eberharter, and Cochran**

As discussed above, the motions to dismiss filed by Officers Hyatt, Eberharter, and Cochran argue that Mr. Driscoll should not have been permitted to amend his complaint to add claims against these officers.  *See* Docket No. 100 at 7; Docket No. 102 at 3–4, ¶¶ 6–10.  Officers Hyatt, Eberharter, and Cochran focus primarily on the impropriety of allowing Mr. Driscoll to amend his complaint because the amendment was futile, given that the claims are barred by the applicable statute of limitations.  Docket No. 100 at 8; Docket No. 102 at 3, ¶¶ 6–9.  In considering whether Mr. Driscoll should have been permitted to amend his complaint, the Court will first consider

whether the second amended complaint relates back to the original complaint such that the claims are deemed to have been filed when Mr. Driscoll filed his original complaint.

### a.  Relation Back

The parties agree that Mr. Driscoll's claims are governed by a two-year statute of limitations.  Docket No. 100 at 8 ("Claims brought under 42 U.S.C. § 1983 are subject to the state statute of limitations for personal injury actions, which in Colorado, is two years." (citing *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1286 (D. Colo. 2009) (citing *Hunt v. Bennett*, 17 F.3d 1263, 1265 (10th Cir. 1994)))); Docket No. 102 at 3, ¶ 7; Docket No. 108 at 5 ("Plaintiff agrees with Defendants that the applicable statute of limitations for 42 U.S.C. 1983 claims in the state of Colorado are two years.").  The parties further agree that Mr. Driscoll's first amended complaint was filed after the limitations period.  *See id.* ("Plaintiff agrees with Defendants that . . . Plaintiff's claims against Defendant[s] would have been barred by the statute of limitations on May 31, 2022, absent other considerations.").  Nevertheless, Mr. Driscoll argues his claims against Officers Hyatt, Eberharter, and Cochran should be deemed to have been filed on October 25, 2021, which is before the applicable statute of limitations had run, because the allegations in his second amended complaint regarding Officers Hyatt, Eberharter, and Cochran relate back to the allegations in his original complaint under Federal Rule of Civil Procedure 15(c).  Docket No. 108 at 6–12.  Allegations in an amended complaint can relate back to the original complaint pursuant to Rule 15(c)(1)(B) or Rule 15(c)(1)(C).  Fed. R. Civ. P. 15(c)(1)(B)–(C).  The Court will first consider whether Mr. Driscoll should have been permitted to amend his complaint because his claims relate back to the original complaint under Rule 15(c)(1)(B).

**b.  Federal Rule of Civil Procedure 15(c)(1)(B)**

"In limited circumstances, Rule 15(c) saves an otherwise untimely amendment by deeming it to 'relate back' to the conduct alleged in the timely original complaint." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 961 (10th Cir. 2012).  Rule 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

Whether an amendment arises out of the same conduct, transaction, or occurrence set out in the original pleading "depends on the existence of a common core of operative facts uniting the original and newly asserted claims."  *May v. Segovia*, 929 F.3d 1223, 1237 (10th Cir. 2019) (citation omitted) (Briscoe, J., concurring).  "For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading."  *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (citation and quotations omitted).  Amendments will generally relate back if they "amplify the facts previously alleged, correct a technical defect in the prior complaint, assert a new legal theory of relief, or add another claim arising out of the same facts." *Benton v. Bd. of Cnty. Comm'rs*, No. 06-cv-01406-PSF-MEH, 2007 WL 4105175, at *3 (D. Colo. Nov. 14, 2007), *aff'd*, 303 F. App'x 625 (10th Cir. 2008) (unpublished) (citation omitted).  "On the other hand, amendments generally will not relate back if they interject entirely different facts, conduct, transactions or occurrences."  *Id.*

Courts usually have found that conduct that is a separate violation of the law does not relate back to a prior violation simply because it involves similar conduct.  *See Eng. Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d 862, 1999 WL 89125, at

*3 (4th Cir. 1999) (table decision) ("A plaintiff may not baldly allege a broad course of conduct over a lengthy period of time and later sue on any act that occurred during that time period.  Because the Hobbs letter is a separate instance of defamation arising from 'facts other than those originally pleaded,' a claim based on that letter does not relate back to the original filing date.") (citation omitted); *Snider v. Pa. DOC*, 505 F. Supp. 3d 360, 416 (M.D. Pa. 2020) (plaintiff's new allegations against correctional facility did not relate back to prior claims against a different correctional facility, despite a claim in original complaint that he "ha[d] similar experiences" at both facilities); *Brightwell v. Hershberger*, 2016 WL 4537766, at *5 (D. Md. Aug. 31, 2016) (finding new claims did not relate back where plaintiff initially brought state tort and § 1983 claims based on an alleged prison assault and then sought to add new claims concerning different assaults, perpetrated by different individuals months before the assault alleged in the original complaint).  "Indeed, even an amendment that shares 'some elements and some facts in common' with the original claim does not relate back if its effect is 'to fault [the defendants] for conduct different from that identified in the original complaint.'"  *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 383 (D.D.C. 2018) (finding age discrimination claim did not relate back to claim for retaliation based on plaintiff complaining about alleged age discrimination) (quoting *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009)); *Slayton*, 460 F.3d at 228 ("even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an 'entirely distinct set' of factual allegations will not relate back").  Moreover, "the statute of limitations runs separately from each action constituting a civil rights violation."  *Cayo v.*

*Fitzpatrick*, 95 F. Supp. 3d 8, 12 (D. Mass. 2015) (citing *Nieves v. McSweeney*, 73 F.Supp.2d 98, 102 (D. Mass.1999)).

### i.    Officer Hyatt

Officer Hyatt argues that the claims added against him in the second amended complaint do not relate back to the allegations in the original complaint under Rule 15(c)(1)(B) because the claims against him are based on a separate incident from the one identified in the original complaint.  Docket No. 102 at 3–8, ¶¶ 6–24.  In particular, Officer Hyatt asserts that the claims against him do not relate back to the incident in the original complaint because Officer Hyatt's interaction with Mr. Driscoll occurred an hour earlier, at a different location, using a sting ball grenade rather than a rubber bullet, and, unlike the later incident, Mr. Driscoll alleges no physical injuries from this interaction.  *Id.* at 4–5, ¶ 11.

Mr. Driscoll responds that his claims against Officer Hyatt do relate back because the original complaint is not focused on the single event where he was shot in the forehead, but rather the original complaint spends pages detailing Denver police officers' use of force against protesters more generally.  Docket No. 110 at 3–4; Docket No. 108 at 7.  Mr. Driscoll highlights the fact that his original complaint included an allegation that he, like other protesters, was subjected to "tear gas and pepper balls." Docket No. 108 at 7 (citing Docket No. 1 at 31, ¶¶ 87, 92).  He contends that the new allegations and claims in the second amended complaint only expand upon this previous allegation and that, therefore, Mr. Driscoll's second amended complaint relates back to his initial complaint.  *Id.*

The Court finds that the allegations and claims in Mr. Driscoll's second amended complaint against Officer Hyatt do not relate back to his original complaint under Rule

15(c)(1)(B).  First, nowhere in Mr. Driscoll's original complaint does he include allegations regarding his interaction with Officer Hyatt.  While Mr. Driscoll's original complaint describes other acts of alleged use of excessive force against protesters and journalists at the George Floyd protests, the conduct from which Mr. Driscoll's claims in his original complaint arise is the police conduct directed at Mr. Driscoll.  The only specific allegations regarding police conduct directed at Mr. Driscoll in his original complaint is the incident where Mr. Driscoll was shot in the forehead.  Docket No. 1 at 32–34, ¶¶ 98–129.

Second, considering the allegations in the original complaint regarding the incident where Mr. Driscoll was shot in the forehead, the allegations and claims against Officer Hyatt do not relate back to the original complaint because the allegations against Officer Hyatt do not "arise[ ] out of the conduct set forth in the original pleading." *Slayton*, 460 F.3d at 228 (citation omitted).  The original complaint does not identify the officer who shot Mr. Driscoll in the forehead.  *See* Docket No. 1.  Despite extensive analysis of discovery, Mr. Driscoll acknowledges that he could not identify that person. Docket No. 108 at 2 ("Although this resulted in the identification of many officers, Plaintiff was unable to identify the officer who shot him in the face.").  However, the original complaint does provide the following details regarding the incident wherein Mr. Driscoll was shot in the forehead: (1) the incident occurred at 10:00 p.m. on May 31, 2020; (2) Mr. Driscoll was marching in a group of approximately one hundred protesters at the intersection of Cherokee Street and 13th Avenue, (3) Denver police officers fired tear gas into the group of protesters to disperse the crowd, (4) Mr. Driscoll raised a plywood sign, (5) Mr. Driscoll was shot in the forehead with a rubber bullet, and (6) as a

14

result of being hit by the rubber bullet, Mr. Driscoll suffered a skull fracture. Docket No. 1 at 31–34, ¶¶ 96, 98, 113, 114, 119, 135–36. The second amended complaint contains the following details regarding Officer Hyatt's interaction with Mr. Driscoll: (1) the incident occurred at 9:09 p.m. on May 31, 2020; (2) Mr. Driscoll was with a group of "several protestors" on Colfax Avenue, (3) Mr. Driscoll had a plywood sign, and (4) Officer Hyatt threw a stingball grenade at Mr. Driscoll's sign. Docket No. 94 at 44, 53, ¶¶ 139, 166–68. The second amended complaint does not allege that Mr. Driscoll was injured by Officer Hyatt's actions. *See id.* at 53–56, ¶¶ 166–88.

The allegations regarding these two incidents have little in common beyond the fact that they both occurred during the George Floyd protests and involved police action against Mr. Driscoll. Instead, Mr. Driscoll's allegations against Officer Hyatt are based on an incident that occurred an hour earlier, at a different location, and involving a different number of protestors than the incident where Mr. Driscoll was shot in the forehead. Moreover, a different type of less lethal munition is involved in each incident. The allegations against Officer Hyatt in Mr. Driscoll's second amended complaint do not expand on the incident where he was shot in the forehead with a rubber bullet. Nor do the allegations against Officer Hyatt constitute new claims or legal theories based on his being shot in the forehead. *Benton*, 2007 WL 4105175, at *3 (amendments will relate back if they "assert a new legal theory of relief[ ] or add another claim arising out of the same facts"). Rather, they are new claims based on separate conduct for which "the statute of limitations runs separately." *Cayo*, 95 F. Supp. 3d at 12.

Finally, the Court finds that the allegation in Mr. Driscoll's original complaint that he was subjected to tear gas and pepper balls does not identify conduct with sufficient

specificity for the allegations against Officer Hyatt to relate back to this allegation.  The original complaint states that Mr. Driscoll "marched, subjecting himself to tear gas and pepper balls."  Docket No. 1 at 31, ¶ 92.  This allegation lacks any pertinent details regarding when, where, how, and by whom Mr. Driscoll was subjected to tear gas and pepper balls.  Furthermore, this allegation does not state that Mr. Driscoll was subjected to stingball grenades.  At most, this allegation references "a broad course of conduct over a lengthy period of time," which does not preserve Mr. Driscoll's right to sue for any act that occurred during the protests.  *Eng. Boiler & Tube*, 172 F.3d 862, at *3.

Accordingly, the Court finds that Mr. Driscoll's claims and allegations against Officer Hyatt do not relate back to the allegations in his original complaint because the second amended complaint asserts claims that arose out of conduct distinct from the conduct set out in the original pleading.  *See* Fed. R. Civ. P. 15(c)(1)(B).

### ii.    Officer Cochran

Officer Cochran argues that the allegations in the second amended complaint regarding his interaction with Mr. Driscoll do not relate back to the original complaint. Docket No. 100 at 6, 9–10.  Mr. Driscoll responds that the allegations in the original complaint sufficiently alleged the course of conduct of Denver Police officers throughout the protest such that the claims and allegations against Officer Cochran relate back to his original complaint.  Docket No. 108 at 6–7.  The allegations in Mr. Driscoll's second amended complaint regarding Officer Cochran are that: (1) Mr. Driscoll's interaction with Officer Cochran occurred at 9:09 p.m. on May 31, 2020; (2) Mr. Driscoll was with a group of "several protestors" on Colfax Avenue, (3) Mr. Driscoll had a plywood sign, (4) after Officer Hyatt threw a stingball grenade at Mr. Driscoll's sign, Officer Cochran shot

a KIP at Mr. Driscoll's sign, and (5) the KIP broke Mr. Driscoll's sign.  Docket No. 94 at 44, 53–56, ¶¶ 132, 166–68, 181–82.

The Court finds that Mr. Driscoll's claims and allegations against Officer Cochran do not relate back to his original complaint under Rule 15(c)(1)(B).  Nowhere in Mr. Driscoll's first amended complaint does he include allegations regarding his interaction with Officer Cochran.  Furthermore, Mr. Driscoll's allegations regarding being shot in the forehead are unrelated to Mr. Driscoll's allegations regarding Officer Cochran shooting his sign.  Although both incidents involve a police officer shooting at Mr. Driscoll with a projectile, the incidents are separated in both time and space.  The allegations against Officer Cochran do not amplify the facts alleged in the original complaint, but instead are new claims based on separate conduct.  Therefore, Mr. Driscoll's claims against Officer Cochran do not relate back to the original complaint.

### iii.  Officer Eberharter

Officer Eberharter argues that the added claims against him are even further unrelated to the allegations in Mr. Driscoll's original complaint than the claims added against Officers Hyatt and Cochran.  Docket No. 100 at 6.  Officer Eberharter asserts that not only did the alleged incident occur at a different location, involve a different method of crowd dispersal, and lack a serious injury, but the incident occurred on a different day.  *Id.* at 6, 9–10.  Mr. Driscoll advances the same arguments as to Officer Eberharter as he does to Officer Cochran regarding whether the second amended complaint relates back to the original complaint.  *See* Docket No. 108 at 6–9.

The Court finds that Mr. Driscoll's allegations against Officer Eberharter do not relate back to the original complaint.  In the second amended complaint, Mr. Driscoll alleges that: (1) at 7:30 p.m. on May 30, 2020, Mr. Driscoll was standing with a small

17

crowd of protesters at the corner of Lincoln Street and Colfax Avenue, (2) Officer Eberharter threw a teargas canister at Mr. Driscoll's feet, and (3) the teargas canister caused Mr. Driscoll severe pain and forced him to stop protesting momentarily.  Docket No. 94 at 35–38, ¶¶ 103–04, 109–10, 113.  Mr. Driscoll's original complaint contains no allegations regarding his interaction with Officer Eberharter.  *See* Docket No. 1.  While the original complaint alleges that Mr. Driscol "drove up on Saturday, May 30, 2020 and participated in marching and chanting all day," and that "he marched, subjecting himself to tear gas and pepper balls," *id.* at 31, ¶¶ 87, 92, these allegations do not identify any details as to how Mr. Driscoll was subjected to tear gas.  Rather, as discussed, these allegations describe, at most, a general course of conduct by police officers at the George Floyd protests, which is insufficient for Mr. Driscoll to later bring claims based on specific incidents of police action taken against him at the protests.  *Eng. Boiler & Tube*, 172 F.3d 862, at *3.

More importantly, the only allegations in Mr. Driscoll's original complaint that identify specific conduct of an officer directed at Mr. Driscoll are the allegations concerning Mr. Driscoll being shot in the forehead.  *See* Docket No. 1 at 32–35, ¶¶ 98, 113, 114, 119, 135–36.  These allegations serve as the basis for Mr. Driscoll's claims in the original complaint.  Mr. Driscoll's allegations regarding Officer Eberharter are based on an incident that occurred on a separate day, in a different location, and involving tear gas rather than a rubber bullet.  Mr. Driscoll's second amended complaint brings new claims against Officer Eberharter based on separate conduct from that alleged in the original complaint.  Mr. Driscoll's allegations regarding Officer Eberharter, therefore, do not relate back under Rule 15(c)(1)(B) because they are based on a separate violation

of the law. *Slayton*, 460 F.3d at 228 ("For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading.") (internal quotations and citation omitted).

### c. Federal Rule of Civil Procedure 15(c)(1)(C)

The parties debate whether the allegations in the second amended complaint relate back to the original complaint under Rule 15(c)(1)(C), in addition to relating back under Rule 15(c)(1)(B). *See* Docket No. 100 at 10–12; Docket No. 102 at 5–6, ¶¶ 13–16; Docket No. 108 at 6. Under Rule 15(c)(1)(C), an amendment may also relate back when "the amendment changes the party or the naming of the party against whom a claim is asserted." Fed. R. Civ. P. 15(c)(1)(C). Under this provision of the rule, three requirements must be met for the amendment to relate back to the original complaint. First, the amendment must "assert[ ] a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Second, the new party must have "received such notice of the action that it will not be prejudiced in defending on the merits" within the service period provided by Rule 4(m) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 15(c)(1)(C)(i). Finally, the plaintiff must demonstrate that the new party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii).

Rule 15(c)(1)(C) is inapplicable to the claims against Officers Eberharter, Cochran, and Hyatt because Mr. Driscoll's amendment did not "change[ ] the party or the naming of the party against whom a claim is asserted." Fed. R. Civ. P. 15(c)(1)(C). Although Mr. Driscoll's second amended complaint does drop the John Doe defendants from his original complaint and bring claims against other named defendants, the claims

brought against Officers Eberharter, Cochran, and Hyatt are new claims based on different incidents.  Mr. Driscoll does not substitute Officers Eberharter, Cochran, or Hyatt for previously unidentified John Doe defendants.  Furthermore, even if Rule 15(c)(1)(C) did apply, the Court has already found that the claims against Officers Eberharter, Cochran, and Hyatt are based on conduct different from that alleged in the original complaint under Rule 15(c)(1)(B), which is a precondition for relation back under Rule 15(c)(1)(C).  *See* Fed. R. Civ. P. 15(c)(1)(C).  As such, the Court finds that it is unnecessary to consider the parties' arguments regarding Rule 15(c)(1)(C).

### 1.  Equitable Tolling

Mr. Driscoll argues that, even if the allegations in his second amended complaint do not relate back to the original complaint under Rule 15(c)(1)(B), amending the complaint was proper because Mr. Driscoll is entitled to equitable tolling of the statute of limitations as to his claims against Officers Eberharter, Cochran, and Hyatt.  Docket No. 108 at 9.

"Statutes of limitation are enacted to promote justice, discourage unnecessary delay, and forestall prosecution of stale claims."  *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996).  Equitable tolling is appropriate in two circumstances: (1) "where the defendant's wrongful conduct prevented the plaintiff from asserting [his] claims in a timely manner," or (2) "where extraordinary circumstances make it impossible for the plaintiff to file [his] claims within the statutory period."  *Brown v. Walker Com., Inc.*, 521 P.3d 1014, 1022 n.5 (Colo. 2022) (quoting *Dean Witter*, 911 P.2d at 1096–97).  "This standard is far higher than that for excusable neglect."  *Id.*

Regarding extraordinary circumstances, "the Colorado Supreme Court has yet to find a case that qualifies as an extraordinary circumstance that would justify tolling."

*Graham v. Teller Cnty., Colo.*, 632 F. App'x 461, 465 (10th Cir. 2015) (unpublished). "However, th[e] court has relied on cases from other jurisdictions to illustrate that tolling may apply when a plaintiff is truly precluded from filing suit." *Braxton v. Zavaras*, 614 F.3d 1156, 1161 (10th Cir. 2010) (citation omitted). Circumstances where plaintiffs were precluded from filing suit include courts in southern states being closed during the Civil War, the plaintiff being interned by Japan during World War II, and where a district court erroneously enforced an unconstitutional statute that barred the plaintiff from filing claims in a timely manner. *See Dean Witter*, 911 P.2d at 1097 (citing *Hanger v. Abbott,* 73 U.S. 532 (1867); *Osbourne v. United States,* 164 F.2d 767 (2d Cir. 1947); *Seattle Audubon Soc'y v. Robertson*, 931 F.2d 590 (9th Cir. 1991)).

Mr. Driscoll argues that "[t]he entire circumstances of these protests and the incredible use of force by hundreds of police officers on thousands of individuals alone makes this an extraordinary circumstance." Docket No. 108 at 10. He claims that, given the circumstances of the protest, protesters were frequently unable to identify which officer had violated their rights. *Id.* He maintains that these circumstances are unique and, therefore, extraordinary. *Id.*

Mr. Driscoll's argument regarding extraordinary circumstances misses the point. The circumstances that must be extraordinary are not those that give rise to Mr. Driscoll's claims, but rather the circumstances that prevented Mr. Driscoll from accessing the courts, such as the courthouse being closed due to war. Mr. Driscoll identifies no extraordinary circumstances that prevented him from accessing the courts before the statute of limitations had run on his claims against Officers Eberharter, Cochran, and Hyatt. In fact, the filing of Mr. Driscoll's original complaint shows that Mr.

Driscoll did have the ability to access the courts. Mr. Driscoll provides no explanation as to why the extraordinary nature of the protests precluded Mr. Driscoll from bringing his claims against Officers Eberharter, Cochran, and Hyatt but did not preclude him from bringing his original claims. Mr. Driscoll was aware of the conduct that gave rise to his claims against Officers Eberharter, Cochran, and Hyatt the moment it happened, but chose not to seek relief based on this conduct until after the statute of limitations had passed. *See Zundel v. Holder*, 687 F.3d 271, 282 (6th Cir. 2012) (plaintiff "may not escape the limitations period by claiming that he did not learn of the grounds for his Bivens claim until 2006" because the misconduct supported a *Bivens* claim at the time it occurred). Mr. Driscoll does not explain why he could not have asserted all the claims and allegations in his second amended complaint against John Doe defendants, similar to the approach he took with his claims against the officer who shot him in the forehead. As such, the Court finds that no extraordinary circumstances existed that made it impossible for Mr. Driscoll to bring his claims against Officers Eberharter, Cochran, and Hyatt within the statute of limitations.

Mr. Driscoll argues that he is also entitled to equitable tolling because Denver police officers, including Officers Eberharter, Cochran, and Hyatt, engaged in wrongful conduct that prevented him from timely asserting his claims. Docket No. 108 at 10. In particular, he claims that the officers' failure to engage their body-worn cameras during the protests was a willful attempt to conceal their identities and to prevent individuals like Mr. Driscoll from filing claims against them. *Id.* at 10–11. Mr. Driscoll claims that, to identify Officers Eberharter, Cochran, and Hyatt, his attorney was required to spend hundreds of hours reviewing videos, documents, and other materials. *Id.* at 2.

Defendants' failure to engage their body-worn cameras explains why Mr. Driscoll did not identify Officers Eberharter, Cochran, and Hyatt by name in his original complaint.  However, the lack of body-worn camera footage does not explain why the original complaint contains no allegations wherein a police officer threw a teargas canister at Mr. Driscoll's feet, another officer threw a sting ball grenade at him, or a third officer broke Mr. Driscoll's sign with a KIP.  Mr. Driscoll has not demonstrated that defendants' wrongful conduct prevented Mr. Driscoll from asserting his claims in a timely manner.  Therefore, Mr. Driscoll has not shown that he is entitled to have his claims against Officers Eberharter, Cochran, and Hyatt equitably tolled.

Mr. Driscoll admits that he filed his second amended complaint after the statute of limitations had passed on his claims against Officers Eberharter, Cochran, and Hyatt. *Id.* at 5.  Moreover, Mr. Driscoll has not shown that the statute of limitations does not preclude him from bringing these claims.  He has not shown his claims against Officers Eberharter, Cochran, and Hyatt relate back to the filing of his original complaint under Rule 15(c)(1)(B).  Nor has he demonstrated that he is entitled to equitable tolling of the statute of limitations as to his claims against these defendants.  Accordingly, the Court finds that Mr. Driscoll should not have been permitted to amend his complaint to add claims against Officers Eberharter, Cochran, and Hyatt because the applicable statute of limitations made it futile for him to add such claims.  Therefore, the Court will grant the motions to dismiss filed by Officers Eberharter, Cochran, and Hyatt and will dismiss

Mr. Driscoll's first, second, third, fourth, and fifth claims as they relate to Officers Eberharter, Cochran, and Hyatt.[4]

### B. <u>Motion to Dismiss by Defendants Pazen, Phelan, and the City and County of Denver</u>

The Court will next consider the motion to dismiss filed on behalf of Denver, Chief Pazen, and Commander Phelan ("the Denver defendants"). Docket No. 99. The second amended complaint brings six claims against the Denver defendants, including a Fourth Amendment claim for excessive force, a Fourteenth Amendment claim for excessive force, a First Amendment claim for violating Mr. Driscoll's rights of free speech and assembly, a First Amendment retaliation claim, a Fourteenth Amendment due process claim, and a Fourth Amendment failure to train or supervise claim. Docket No. 94 at 68–81, ¶¶ 277–386. The Denver defendants move pursuant to Rule 12(b)(6) to dismiss Mr. Driscoll's failure to train or supervise claim as to Denver. Docket No. 99 at 3–5. In particular, the Denver defendants argue that the allegations in Mr. Driscoll's second amended complaint fail to state a claim for municipal liability because they do not plausibly allege that Denver failed to adequately train and supervise its employees. *Id.* at 3. The Denver defendants also argue that Mr. Driscoll's claims against Chief Pazen and Commander Phelan should be dismissed because Chief Pazen and Commander Phelan are entitled to qualified immunity. *Id.* at 5. The Court will first consider whether Mr. Driscoll's second amended complaint adequately states a claim for municipal liability for Denver's failure to train its employees.

---

[4] Defendant Hyatt argues, in the alternative, that Mr. Driscoll's second and fifth claims brought under the Fourteenth Amendment are improper because Mr. Driscoll has brought claims under the Fourth Amendment. Docket No. 102 at 7–8, ¶¶ 22–24. Because the Court has found that the claims against defendant Hyatt should be dismissed, the Court will not address defendant Hyatt's alternative argument.

### 1.  The City and County of Denver

The allegations in the second amended complaint regarding Mr. Driscoll's failure to train claim against Denver, Chief Pazen, and Commander Phelan state that Mr. Driscoll "incorporates by reference the allegations contained in the foregoing paragraphs."  Docket No. 94 at 79, ¶ 373.  The preceding allegations include Mr. Driscoll's allegations regarding the incident wherein he was shot in the forehead, as well as his allegations regarding his interactions with Officers Eberharter, Cochran, and Hyatt.[5]  *Id.* at 34–64, ¶¶ 83–246.  The allegations in Mr. Driscoll's failure to train claim states that "Defendants unlawfully seized Plaintiff by means of excessive physical force, including use of chemical agents and KIPs."  *Id.* at 80, ¶ 378.  Mr. Driscoll further alleges that:

> 379.  Defendants Denver, Pazen, and Phalen had an obligation to ensure that their officers were properly trained in responding to First Amendment activity, including criticism of officers, and the use of less lethal munitions.

> 380.  Defendants Denver, Pazen, and Phalen were made aware over the course of several evenings that DPD officers were using less lethal munitions, including rubber bullets, in a retaliatory manner.

> 381.  Defendants Denver, Pazen, and Phalen were made aware over the course of several evenings that DPD officers were using less lethal munitions, including rubber bullets, in a dangerous manner, often aiming for heads and seeking to inflict the maximum damage possible on protesters.

> 382.  Defendants Denver, Pazen, and Phalen had a duty to the citizens of Denver and the protesters to stop the use of excessive and often deadly force against protesters who were not threatening any bodily harm.

---

[5] The Denver defendants do not argue that Mr. Driscoll should not have been permitted to amend his complaint to add the failure to train and supervise claim nor do they argue that the allegations regarding Officers Eberharter, Cochran, and Hyatt should be stricken from the complaint.  *See* Docket No. 99.  As such, while the Court will dismiss the claims against Officers Eberharter, Cochran, and Hyatt, the Court will consider the allegations against these officers to the extent they are relevant to Mr. Driscoll's claims against the Denver defendants.

383.  Defendants Denver, Pazen, and Phalen failed to train their officers in the use of these less lethal munitions and in how to respond to protest movements.

*Id.* at 80, ¶¶ 379–83.  The Denver defendants argue that these allegations are insufficient to state a claim for municipal liability against Denver.  Docket No. 99 at 3–5.[6]

Municipalities may not be sued under 42 U.S.C. § 1983 on a theory of respondeat superior for the actions of their employees.  *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 692 (1978).  Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690.  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

---

[6] There is an ambiguity in the Denver defendants' motion that they clarify in their reply brief.  The Denver defendants' motion states that "Plaintiff asserts claims against Denver under 42 U.S.C. § 1983 for its alleged failure to adequately train and supervise its employees to properly respond to First Amendment activity and deploy munitions."  Docket No. 99 at 3.  The motion then cites to paragraphs 373 through 386 of Mr. Driscoll's second amended complaint, which correspond only to Mr. Driscoll's sixth claim, titled "Fourth Amendment Violation – Failure to Train or Supervise."  *Id.* (citing Docket No. 94 at 79–81, ¶¶ 373–86).  In his response, Mr. Driscoll argues that his second amended complaint "raised three distinct bases for liability: 1) custom or practice; 2) failure to train; and 3) ratification."  Docket No. 111 at 4.  He then cites to allegations contained in each of his first five claims.  *Id.* (citing Docket No. 94 at 70–79, ¶¶ 292–95, 311–13; 331–33, 350–52, 367–69).  In their reply, the Denver defendants clarify that "Denver's motion to dismiss only argues the facial deficiency of his failure-to-train claim."  Docket No. 119 at 2.  It refers to this claim in the singular throughout the rest of the brief.  *See, e.g.*, *id.*  Accordingly, the Court will only consider the parties' arguments as they relate to a failure to train theory of municipal liability and only as they relate to Mr. Driscoll's sixth claim for relief.  The Court will not consider Mr. Driscoll's arguments regarding ratification and custom or practice and will not consider the allegations in his first five claims for relief except to the extent they are relevant to Mr. Driscoll's sixth claim for relief.

said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

In order to state a claim for municipal liability under § 1983 for the actions of municipal employees, a plaintiff must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employees committed a constitutional violation;[7] and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

To state a *Monell* claim based on the failure to train, "a plaintiff must sufficiently allege that the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Rehberg v. City of Pueblo*, No. 10- cv-00261-LTB-KLM, 2012 WL 1326575, at *4 (D. Colo. Apr. 17, 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S.

---

[7] The Denver defendants do not challenge whether Mr. Driscoll has adequately alleged a constitutional violation by the unidentified officer who shot Mr. Driscoll in the forehead. *See* Docket No. 99 at 2–5.

808, 822–23 (1985) (plurality opinion) (discussing how a policy of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

A plaintiff cannot state a *Monell* liability claim based on the failure to train by generally alleging that employees were not properly trained.  Instead, a plaintiff must allege how the employees were trained and how the training was deficient.  *See, e.g., Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1072 (D. Colo. 2021) (finding the plaintiff's failure-to-train allegations insufficient where the plaintiff did not state how the officers were trained and who trained them)*; Cook v. Whyde,* No. 20-cv-02912-PAB-STV, 2021 WL 4459051, at *16 (D. Colo. Sept. 29, 2021) (dismissing *Monell* claim for failure to allege specific facts concerning how the defendants were trained or why the training was deficient); *Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017) ("Notice of particular deficiencies in a training program is the crux of a failure-to-train theory."); *Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained, but had not "allege[d] specific deficiencies in training and supervision, or explain[ed] how the incident described in the Amended Complaint could have been avoided with different or better training and supervision").

Mr. Driscoll argues that the allegations in the second amended complaint plausibly allege a claim for *Monell* liability against Denver based on Denver's failure to train its officers.  Docket No. 111 at 8–9.  Mr. Driscoll maintains that for a failure to train

claim, "a Plaintiff need only allege that: (1) 'the officers exceeded constitutional limitations'; (2) the constitutional violation 'arose under circumstances that constitute a usual and recurring situation with which police officers must deal'; (3) the inadequate supervision and discipline 'demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact'; and (4) 'there is a direct causal link between the constitutional deprivation and the inadequate' supervision and discipline."  *Id.* (quoting *Allen v. Muskogee*, 119 F.3d 837, 841–42 (10th Cir. 1997)). The entirety of Mr. Driscoll's argument regarding the allegations in his second amended complaint is that "Plaintiff has alleged Denver failed to train its officers on responding to First Amendment activity and on the use of less-lethal weapons."  *Id.* at 9.  He then cites each of the allegations in his sixth claim for relief.  *Id.* (citing Docket No. 94 at 80, ¶¶ 379–83).[8]

The second amended complaint's allegations concerning officer training do not plausibly allege a specific training deficiency that led to Mr. Driscoll's constitutional injuries.  The allegations establish that the Denver defendants were aware of the fact that some Denver police officers were using less lethal munitions in a dangerous

---

[8] In his response, Mr. Driscoll references a report made by his retained expert which "more fully articulates in detail" the Denver defendants' alleged failures to train. *See* Docket No. 111 at 4, 8 n.3, 9.  Mr. Driscoll states that, "[i]f the Court would prefer, Plaintiff will gladly amend his Complaint to include relevant portions of his expert report." *Id.* at 9.  In fact, Mr. Driscoll sought leave to file a third amended complaint to incorporate new allegations based on his expert's report.  Docket No. 136.  Magistrate Judge Neureiter recommended that the Court deny leave to amend the complaint, finding that Mr. Driscoll had not made diligent efforts to meet the scheduling deadlines in the case and that Mr. Driscoll's motion was untimely.  Docket No. 164 at 9.  Mr. Driscoll did not file an objection, and the Court adopted the recommendation.  Docket No. 169.  Accordingly, the Court will consider only the allegations in the second amended complaint.

manner over a period of days.  Docket No. 94 at 80, ¶ 381.  The complaint does not state any facts concerning how the officers were trained, who trained them, why their training was deficient, or how Mr. Driscoll's injuries could have been avoided with different training.

Mr. Driscoll argues that "[e]vidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability."  Docket No. 111 at 9 (quoting *Allen*, 119 F.3d at 842).  However, the allegations in Mr. Driscoll's complaint, taken as true, do not show that Denver failed to train its officers to handle recurring situations presenting an obvious potential for violating Mr. Driscoll's constitutional rights.  There are no allegations regarding what training Denver's employees received.  Moreover, there are no allegations that show that the circumstances of the George Floyd protests were recurring.  Rather, the allegations in the complaint demonstrate that the size of the protests, as well as the type of crowd control needed and the techniques deployed, were unusual.  In fact, Mr. Driscoll elsewhere argues that the circumstances of the protest were so unusual that they were extraordinary.  Docket No. 108 at 10.  Because Mr. Driscoll's second amended complaint does not contain allegations regarding what training Denver provided its police officers, the complaint does not plausibly allege a claim for *Monell* liability against Denver based on a failure to train.[9]  Accordingly, the

---

[9] Mr. Driscoll does not argue that Denver is liable under his sixth claim for relief based on a failure to supervise.  *See* Docket No. 111 at 4–9.  Mr. Driscoll instead argues that Chief Pazen and Commander Phelan are liable under a theory of supervisory liability.  *Id.* at 11–15.  Mr. Driscoll's sixth claim is brought against Denver, Chief Pazen, and Commander Phelan separately.  Docket No. 94 at 80, ¶¶ 379–83.

Court will grant that portion of the Denver defendants' motion to dismiss seeking

dismissal of Mr. Driscoll's sixth claim as it relates to the City and County of Denver.

### 2. *Defendants Pazan and Phelan*

In addition to bringing his claims against the officers directly involved in the

incidents described in Mr. Driscoll's second amended complaint, Mr. Driscoll brings

each of his six claims against Chief Pazen and Commander Phelan. These include Mr.

Driscoll's Fourth Amendment and Fourteenth Amendment claims for excessive force

and Mr. Driscoll's claims for violations of his First Amendment rights. *See* Docket No.

94 at 68–81, ¶¶ 277–386. Mr. Driscoll brings his claims against Chief Pazen and

Commander Phelan under a theory of supervisory liability.[10]  *See* Docket No. 111 at

11–15.

"A § 1983 defendant sued in an individual capacity may be subject to personal

liability and/or supervisory liability." *Est. of George v. City of Rifle, Colo.*, 85 F.4th 1300,

---

Because Mr. Driscoll does not contend that Denver is liable for its failure to supervise its employees, the Court will not consider the issue. However, even if the Court were to consider whether the allegations in the complaint state a claim for a failure to supervise against Denver, the Court's analysis would be the same. *See Zartner v. City & Cnty. of Denver*, 242 F. Supp. 3d 1168, 1173 (D. Colo. 2017) (stating that the *Allen* factors "applies to claims related to a failure to supervise as well"). Mr. Driscoll's complaint contains no allegations regarding how Chief Pazen, Commander Phelan, or any other Denver employee supervised and disciplined the officers involved in Mr. Driscoll's claims. Nor do the allegations in his complaint show that Mr. Driscoll's injuries at the George Floyd protests "arose under circumstances that constitute a usual and recurring situation." *Allen*, 119 F.3d at 842.

[10] As discussed in greater detail below, Mr. Driscoll does not allege that either Chief Pazen or Commander Phelan personally participated in the incidents described in his second amended complaint, only that they supervised and directed police officers at the George Floyd protests. As such, he can only bring a claim against Chief Pazen or Commander Phelan on a theory of supervisory liability. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Est. of Yoemans by & through Ishmael v. Campbell*, 501 F. Supp. 3d 1034, 1053 (D. Colo. 2020) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).

1320–21 (10th Cir. 2023) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014)).  "Section 1983, however, does not authorize liability under a theory of respondeat superior."  *Id.* (citations omitted).  Put differently, § 1983 "does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (citing *Jenkins v. Wood,* 81 F.3d 988, 994–95 (10th Cir.1996)).  Instead, to state a claim for supervisory liability, "the plaintiff must show an 'affirmative link' between the supervisor and the constitutional violation."  *Lieberenz v. Wilson*, 2024 WL 2952150, at *9 (10th Cir. June 12, 2024) (citing *Estate of Booker*, 745 F.3d at 435).  This affirmative link can be established "between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  *Fogarty*, 523 F.3d at 1162 (10th Cir. 2008) (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993)).  This requires "more than a supervisor's mere knowledge of his subordinate's conduct."  *Est. of Booker*, 745 F.3d at 435 (citation omitted).  A plaintiff must plausibly allege three elements to state a successful § 1983 claim against a defendant based on his supervisory responsibilities: "(1) personal involvement; (2) causation; and (3) state of mind."  *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (citation omitted); *see also Dodds v. Richardson*, 614 F.3d 1185, 1194–95 (10th Cir. 2010).

The allegations in the second amended complaint regarding Chief Pazen's and Commander Phelan's supervisory actions include the following:

5.  . . . .  Defendant Pazen was responsible for supervising individual Defendants and all Denver police officers and mutual aid partner officers responding to the

George Floyd Protests and directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 31, 2020.

6.   . . . . [A]s Commander of Special Operations for the Denver Police Department. . . Defendant Phelan was in direct command of the officers responding to the George Floyd protests.  Defendant Phelan was responsible for supervising individual Defendants and all Denver police officers and mutual aid partner officers responding to the George Floyd Protests and directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 31, 2020.

. . . .

43.  Throughout these days of protests, Defendant Phelan, as Commander of the police response to the protests and Defendant Pazen, as chief of police, were made aware of the gratuitous use of force by their officers.  Complaints were made by protesters along with calls from elected officials, imploring that the DPD and its officers stop using such brutality against those seeking change.

44.  DPD has body cameras and overhead videos, called HALO cameras, capturing much of the police violence.  There were videos circulating online and being shown to Defendants Phelan and Pazen.

45.  Nonetheless, these Defendants took no action to rein in their officers.  They knew of the brutality being inflicted and they ratified it each day with their indifference or support.

. . . .

65.  Defendants Phelan and Pazen were made aware of the injuries to heads and eyes.  They were told that protesters were being hit in the head and that people were exhibiting serious injuries at the hands of their subordinate police officers.

66.  They took no action.

. . . .

293.  The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Defendant Phelan.

. . . .

381.  Defendants Denver, Pazen, and Phalen were made aware over the course of several evenings that DPD officers were using less lethal munitions, including rubber bullets, in a dangerous manner, often aiming for heads and seeking to inflict the maximum damage possible on protesters.

Docket No. 94 at 2–3, 14, 18, 70, 80, ¶¶ 5, 6, 43, 44, 45, 65, 66, 293, 381.

The Denver defendants argue that Chief Pazen and Commander Phelan are entitled to qualified immunity because these allegations are insufficient to establish that Chief Pazen and Commander Phelan's actions as supervisors violated Mr. Driscoll's clearly established constitutional rights.  Docket No. 99 at 5–15.

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson v. Creighton,* 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran,* 242 F.3d 905, 916–17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff[s] 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'"  *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v.*

*Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.  The Court will consider first whether Mr. Driscoll has met his burden of demonstrating that the rights he alleges Chief Pazen and Commander Phelan violated were clearly established.

### a.  Clearly Established

The Denver defendants argue that none of the allegations in Mr. Driscoll's second amended complaint show that Chief Pazen or Commander Phelan violated a clearly established right.  Docket No. 99 at 14.  The Denver defendants argue that:

> Plaintiff has not set forth any facts showing that Pazen or Phelan committed any constitutional violation.  But even if he had, Plaintiff cannot establish that the specific rights at issue were clearly established prior to May 30, 2020, or that a reasonable supervisory officer in Defendants' position that day would have known they were violating the law.  On the contrary, clearly established law in May 2020 permitted the use of less-lethal munitions for the dispersal of crowds under the circumstances present here.  *See, e.g.*, *Cox v. State of La.*, 379 U.S. 536, 554 (1965); *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001); *Ellsworth v. City of Lansing*, 205 F.3d 1340, *3–4 (6th Cir. Feb. 10, 2000) (table decision). . . .  [A]ll of Plaintiff's claims against Defendants must be dismissed. [11]

---

[11] The Court finds that the Tenth Circuit's decision in *Packard v. Budaj*, 86 F.4th 859, 869 (10th Cir. 2023), contradicts the Denver defendants' assertion regarding Mr. Driscoll's clearly established rights.  In *Packard*, a protester at the George Floyd protest in Denver was knocked unconscious by a beanbag round shot by a police officer.  *Id.* at 862.  In addressing the second prong of the qualified immunity analysis, the court found that it was "clearly established that an officer cannot shoot a protester with pepper balls

*Id.* at 15.

The Denver defendants having invoked qualified immunity, the burden falls on Mr. Driscoll to show that the rights Chief Pazen and Commander Phelan violated were "clearly established" at the time of their conduct. *Hernandez v. Norton*, No. 23-cv-00548-GPG-STV, 2023 WL 9375631, at *2 (D. Colo. Dec. 28, 2023) ("Where, as here, police officers invoke the doctrine of qualified immunity, the burden shifts to the plaintiff to make a . . . showing . . . that the contours of th[e] violation were 'clearly established' at the time of the events."). To be clearly established, "[i]t is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Packard*, 86 F.4th at 868 (quoting *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 12 (2021)). Moreover, Mr. Driscoll cannot rely on a theory of respondeat

---

or other less-lethal munitions when that protester is committing no crime more serious than a misdemeanor, not threatening anyone, and not attempting to flee." *Id.* at 868–69. Taking the allegations in Mr. Driscoll's second amended complaint as true that, at the time he was shot in the forehead, he was committing no crime, was not threatening anyone, and was not attempting to flee. Docket No. 94 at 59, ¶¶ 204–06. It was clearly established that the conduct of the officer who shot Mr. Driscoll in the forehead violated Mr. Driscoll's constitutional rights. *Packard*, 86 F.4th at 869. Therefore, in considering whether Mr. Driscoll has carried his burden to show that Chief Pazen and Commander Phelan are not entitled to qualified immunity, the Court will focus on whether Mr. Driscoll has plausibly stated a supervisory liability claim based on the incident wherein he was shot in the forehead. The allegations regarding Chief Pazen's and Commander Phelan's supervision of the officer who shot him in the forehead are identical to the allegations regarding their supervision of the officers in Mr. Driscoll's other alleged constitutional violations. As such, if Mr. Driscoll has failed to adequately allege a claim for supervisory liability regarding his being shot in the forehead, he has also failed to plausibly allege supervisory liability as to the other alleged violation of his rights. However, as discussed below, to show that Chief Pazen and Commander Phelan are liable under a theory of supervisory liability, Mr. Driscoll must do more than show that one of Chief Pazen's and Commander Phelan's subordinates violated Mr. Driscoll's rights.

superior, *Est. of George*, 85 F.4th at 1321, nor can he rely solely on the fact that it was clearly established that the conduct of the subordinate was a constitutional violation. *Perry*, 892 F.3d at 1123.  "Instead, to satisfy the second part of the qualified-immunity test in the context of [a] supervisory-liability claim" a plaintiff must show that as of the date in question "clearly established law . . . would . . . have put a reasonable official in [the supervisor's] position on notice that his *supervisory conduct* would" violate plaintiff's constitutional rights.  *Id.* (quoting *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015)).  In other words, Mr. Driscoll must "'identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution.  *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (alterations omitted)); *see also Cox*, 800 F.3d at 1247 ("we elect to focus on the second prong – wherein we inquire whether, under Ms. Cox's version of the facts, then-extant clearly established law would have given Sheriff Glanz fair warning that he could be held liable for his conduct under a supervisory-liability theory for violating Mr. Jernegan's Eighth Amendment rights").

Mr. Driscoll argues that "[t]he law of this circuit reasonably put Defendants on notice that their actions were unconstitutional."  Docket No. 111 at 14.  Mr. Driscoll identifies two cases that he believes clearly establish that Chief Pazen and Commander Phelan violated Mr. Driscoll's constitutional rights.  *Id.*  First, Mr. Driscoll relies on the Tenth Circuit's decision in *Fogarty*, 523 F.3d at 1162.  He claims that, in *Fogarty*, the court "held that multiple supervisory officers during a protest who were charged with supervising other officers who used excessive force against the peaceful crowd were not entitled to qualified immunity where there was evidence that the supervisory officers 'set[ ] in motion a series of acts by others . . . , which he knew or reasonably should

have known, would cause others to inflict the constitutional injury." *Id.* (quoting *Fogarty*, 523 F.3d at 1164–65). Mr. Driscoll asserts that "[t]his exact scenario is alleged as to Defendants and *Fogarty* would put them on notice that their actions violated the Constitution." *Id.*

In *Fogarty*, the plaintiff was arrested during an antiwar protest in which 500 to 1,000 individuals participated. *Fogarty*, 523 F.3d at 1150. As part of his protest, Mr. Fogarty participated in a drum circle outside a bookstore near the University of New Mexico. *Id.* at 1150–51. After twenty minutes of drumming, Captain John Gonzales ordered Albuquerque Police to "remove the drums," which some officers took as an order to arrest members of the drum circle. *Id.* at 1151–52. Captain Gonzales supervised the seventy-five officers responding to the protest. *Id.* at 1150. At some point during the protest, officers deployed less lethal munitions and tear gas. *Id.* at 1152. Mr. Fogarty was arrested and was later transported to a hospital because of an asthma attack he was having in response to the tear gas. *Id.* At summary judgment, the district court found that Captain Gonzales was not entitled to qualified immunity. *Id.* at 1163. Mr. Fogarty brought Fourth Amendment claims against Captain Gonzalez based on a theory of supervisory liability for Mr. Fogarty's arrest without probable cause and for the use of excessive force against Mr. Fogarty during his arrest, including the use of tear gas and injuries to Mr. Fogarty's wrist. *Id.*

The district court determined that Captain Gonzales was not entitled to qualified immunity. *Id.* The court found that Captain Gonzales was directly involved, and thereby "personally participated," in Mr. Fogarty's arrest because "John Gonzales either explicitly ordered that the drummers be arrested, or ordered that their drums be taken

and that arrests be made as a last resort.  Under either set of facts, the district court reasoned that Fogarty was arrested as a result of John Gonzales' direct order."  *Id.*  "As for the excessive force claim, the district court considered both John Gonzales' involvement with the general deployment of tear gas and projectiles, and his role in Fogarty's arrest.  With regard to the former, it found that John Gonzales gave orders to subordinates, moved through the crowd supervising the event, and personally ordered the use of the tear gas that caused some of Fogarty's injuries."  *Id.*  The district court "reasoned that as the incident commander who planned the APD response to the protest, ordered certain arrests, and controlled the deployment of chemical munitions and less lethal projectiles, John Gonzales could be held liable under § 1983 as a supervisor."  *Id.*  The Tenth Circuit affirmed, stating "we agree with its legal conclusion that an 'affirmative link' exists between John Gonzales' actions and the alleged constitutional deprivations," such that Captain Gonzales was personally involved in the events leading to Mr. Fogarty's injuries.  *Id.*  The court stated that, "[a]t the very least, under Fogarty's version of the facts, John Gonzales 'set in motion a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury.'"  *Id.* at 1164 (citation and alterations omitted).

The Court finds that *Fogarty*, 523 F.3d at 1164, is not clearly established law that would have put a reasonable official in Chief Pazen's and Commander Phelan's position on notice that their supervisory conduct would violate Mr. Driscoll's constitutional rights. The supervisory conduct in *Fogarty* involved a supervisor who was directly involved in the incident that gave rise to the plaintiff's injuries.  Captain Gonzales was present at the protest, moved through the crowd supervising the event, and was specifically aware

of Mr. Fogarty's conduct.  Moreover, Captain Gonzales ordered the arrest of Mr.

Fogarty and ordered the use of tear gas that caused Mr. Fogarty's injuries.  Here, the

only allegations regarding the supervisory actions of Chief Pazen and Commander

Phelan are that they were "responsible for supervising individual Defendants and all

Denver police officers and mutual aid partner officers responding to the George Floyd

Protests and directing their actions."  Docket No. 94 at 2–3, ¶¶ 5, 6.  The allegations in

the second amended complaint state that Chief Pazen and Commander Phelan were

"made aware of the gratuitous use of force by their officers," that they were shown

videos of police violence, and that they "took no action."  *Id.* at 14, 18, 70, 80, ¶¶ 43, 44,

45, 65, 66, 293, 381.  There are no allegations that either Chief Pazen or Commander

Phelan was present when Mr. Driscoll was shot in the forehead, and there are no

allegations that Chief Pazen or Commander Phelan was aware of Mr. Driscoll or

learned of the events that led to Mr. Driscoll being shot.  Moreover, there are no

allegations that Chief Pazen or Commander Phelan ordered the use of tear gas or KIPs

alleged in Mr. Driscoll's second amended complaint.  Mr. Driscoll does not allege any

specific conduct by Chief Pazen or Commander Phelan and instead bases their liability

on the fact that they "took no action."  As such, the supervisory conduct at issue in

*Fogarty* would not have put Chief Pazen or Commander Phelan on notice that their

inaction or, alternatively or in combination, their general responsibility for supervising

and directing all police action at the George Floyd protests, would violate Mr. Driscoll's

constitutional rights.

Mr. Driscoll argues that *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir.

2008), clearly establishes that Chief Pazen and Commander Phelan violated his

constitutional rights.  Docket No. 111 at 12.  He asserts that, "in *Buck*, the Tenth Circuit held that an incident commander, who was supervising officers on the ground and gave directives authorizing the deployment of tear gas on protesters, was liable as a supervisor for the constitutional violations caused by the deployment of the tear gas by those under his control."  *Id.* (citing *Buck*, 549 F.3d at 1288, 1291).

In *Buck*, plaintiffs brought claims against Captain Gonzales based on incidents arising from the same antiwar protest as in *Fogarty*.  *Buck*, 549 F.3d at 1274 ("We need not restate the background underlying the antiwar protest, as our related opinion in *Fogarty v. Gallegos,* 523 F.3d 1147, 1150–53 (10th Cir. 2008), has already done so."). The Tenth Circuit affirmed the district court's conclusion that:

> there is an *affirmative link between Defendant Gonzales and the use of excessive force against Plaintiffs Chavez, Doyon, and Michael Kisner sufficient to overcome a motion for summary judgment.*  Seen in the light most favorable to these three Plaintiffs, the evidence suggests that Defendant Gonzales set in motion a series of events that *he knew or reasonably should have known* would cause his officers to violate Plaintiffs Chavez, Doyon, and Michael Kisner's constitutional rights when he authorized the use of pepper ball rounds, ordered Plaintiff Doyon's arrest, and ordered his officers to sweep people from the front of the Frontier restaurant.

*Id.* at 1291.  The court found that "Capt. Gonzales allowed and encouraged the use of force against compliant demonstrators."  *Id.*  The court distinguished Captain Gonzales' actions from the actions of the supervisor in *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1191 (10th Cir. 2001).  *Id.*  The court found that, whereas the plaintiffs in *Holland* "did not show that defendants decided to use the SWAT team knowing that the SWAT team would use excessive force, intending to cause harm to any person, or that they instructed the SWAT team to use excessive force while conducting the raid," *id.* (quoting *Holland*, 268 F.3d at 1191 (alterations omitted)), "Capt. Gonzales did not want

his officers to act independently."  Rather, Captain Gonzales "contacted his officers through radio, hand signal, and direct verbal command"; "[h]e deployed chemical munitions, and also ordered the deployment of tear gas, pepper ball rounds, and bean bag projectiles"; and "[h]e directed the arrest of several protestors and encouraged the arrests of others."  *Id.*  The court found that Captain Gonzales was not entitled to qualified immunity because he was liable for this supervisory conduct.  *Id.* at 1291–92.

As with *Fogarty*, *Buck* involved a supervisor who ordered his subordinates to take certain actions that he knew or reasonably should have known would violate a plaintiff's constitutional rights.  Here, there are no allegations that Chief Pazen or Commander Phelan communicated with the officer who shot Mr. Driscoll in the forehead or ordered the use of KIPs on Mr. Driscoll.  Rather, Mr. Driscoll argues that Chief Pazen and Commander Phelan failed to act on information that was given to them at an unspecified time.  Docket No. 94 at 18, ¶ 66.  Because neither *Fogarty* nor *Buck* are applicable to the supervisory conduct of Chief Pazen or Commander Phelan in this case, Mr. Driscoll has failed to meet his burden of demonstrating that, on the day Mr. Driscoll was shot in the forehead, clearly established law would have put a reasonable official in Chief Pazen's or Commander Phelan's position on notice that "his supervisory conduct would" violate Mr. Driscoll's constitutional rights.[12]  *Perry*, 892 F.3d at 1123 (emphasis omitted).

---

[12] Mr. Driscoll cites *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000), in support of the proposition that "any form of official retaliation for exercising one's freedom of speech . . . constitutes an infringement of that freedom."  Docket No. 111 at 15.  *Worrell* does not provide clearly established law that Chief Pazen's or Commander Phelan's supervisory conduct was unconstitutional.  Instead, the right at issue in *Worrell* was Mr. Worrell's right to testify at trial.  *Worrell*, 219 F.3d at 1215 ("Mr. Worrell has alleged that Mr. Turner violated his First Amendment right to testify at trial.  Decisions of

"If the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense."  *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)) (alterations omitted); *see also Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) (noting that "plaintiff bears the burden of citing to [the court] what he thinks constitutes clearly established law" (citation omitted)); *Est. of Melvin by & through Melvin v. City of Colo. Springs, Colo.*, 2023 WL 8539921, at *6 (10th Cir. Dec. 11, 2023) (granting qualified immunity to the officers because the plaintiff "failed to meet its burden to show the constitutional right at issue was clearly established"); *Flores v. Henderson*, 101 F.4th 1185, 1193 (10th Cir. 2024) (noting that a "court must grant the defendant qualified immunity if the plaintiff fails to prove either prong" (citation omitted)).  Because Mr. Driscoll has failed to meet his burden as to the second prong of the qualified immunity test, the Court finds that it is unnecessary to reach the parties' arguments regarding the first prong.  *Cummings*, 913 F.3d at 1239 ("Because we need not do so, we do not reach the first prong of the qualified-immunity standard.").  Therefore, the Court grants the Denver defendants' motion to dismiss and dismisses all of Mr. Driscoll's claims as to Chief Pazen and Commander Phelan.

---

this circuit have held that the right to testify truthfully is clearly established.").  Mr. Driscoll also cites *Esparza v. Bowman*, 523 F. App'x 530, 536 (10th Cir. 2012) (unpublished).  Docket No. 111 at 15.  In *Esparza*, the court held that the plaintiff's "First Amendment right to be free from retaliatory arrest was clearly established."  *Esparza*, 523 F. App'x at 536.  The case did not involve supervisory liability and does not provide clearly established law that Chief Pazen's or Commander Phelan's conduct was unconstitutional.

### b.  Constitutional Violation

Moreover, even if the Court were to consider whether the allegations in the second amended complaint plausibly allege that Chief Pazen and Commander Phelan violated Mr. Driscoll's constitutional rights, the Court would find that Mr. Driscoll fails to meet his burden on prong one of the qualified immunity test.  As discussed, to state a claim for supervisory liability, Mr. Driscoll must show: "(1) personal involvement; (2) causation; and (3) state of mind."  *Perry*, 892 F.3d at 1121 (citation omitted).

### i.  Personal Involvement

The Tenth Circuit has repeatedly declined to circumscribe the exact parameters of what constitutes "personal involvement" post-*Iqbal*.  *See*, *e.g.*, *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) ("We have since recognized that *Iqbal* may have changed the § 1983 supervisory liability landscape, but we have not yet had occasion to determine what allegations of personal involvement meet *Iqbal*'s stricter liability standard." (alterations, citation, and quotations omitted)); *Dodds*, 614 F.3d at 1195. Instead, the Tenth Circuit has found that certain types of claims clearly remain within the scope of supervisory liability under § 1983.  *Dodds*, 614 F.3d at 1199 ("we conclude the following basis of § 1983 liability survived [*Iqbal*] . . . : § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution" (citation, quotations, and alterations omitted).  The court has explained that "[t]he exercise of control which may create the 'affirmative link' does not need to be . . . on-the-ground, moment-to-moment control," but rather that "the establishment or

44

utilization of an unconstitutional policy or custom can serve as the supervisor's 'affirmative link' to the constitutional violation."  *Id.* (quoting *Davis v. City of Aurora*, 705 F.Supp.2d 1243, 1263 (D. Colo. 2010)).  "[W]here an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application."  *Id.* (quoting *Davis*, 705 F.Supp.2d at 1264).

Mr. Driscoll argues that he has plausibly stated a claim for supervisory liability against Chief Pazen and Commander Phelan because his second amended complaint alleges that "Defendants Pazen and Phelan exercised supervisory control over individual officers and authorized their conduct both before and after the fact."  Docket No. 111 at 12 (citing Docket No. 94 at 2–3, 70, 72, 74, 76, ¶¶ 5, 6, 293, 311, 331, 353). Paragraphs five and six of the second amended complaint state that Chief Pazen and Commander Phelan were "responsible for supervising individual Defendants and all Denver police officers and mutual aid partner officers responding to the George Floyd Protests and directing their actions."  *Id.* at 2–3, ¶¶ 5, 6.  Paragraphs 293, 311, 331, and 353 of Mr. Driscoll's second amended complaint state that "[t]he actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen and Commander Phelan."  *Id.* at 70, 72, 74, 76, ¶¶ 293, 311, 331, 353.

First, these allegations are conclusory, and the Court is not required to accept them as true.  *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions"); *see also Neal v. U.S. Penitentiary Atwater*, 2009 WL 2852406, at *5 (E.D. Cal. Sept. 2,

2009) (holding that plaintiff's allegation "that Cobb directed and supervised all the mass searches during lock-downs at USP–Atwater" was insufficient to state a claim for supervisory liability because "plaintiff must allege some facts that would support a claim that supervisory defendants either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or implemented a policy so deficient that the policy itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation" (citation and quotations omitted)).

Second, the allegations in Mr. Driscoll's complaint do not establish that Chief Pazen or Commander Phelan "create[d], promulgate[d], [or] implement[ed]" a policy the enforcement of which caused Mr. Driscoll's injuries. *Dodds*, 614 F.3d at 1199.  The only allegations in Mr. Driscoll's second amended complaint regarding a policy that led to Mr. Driscoll's injuries are that "Defendant Denver has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution," Docket No. 94 at 70, ¶ 292, and that "Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution."  *Id.* at 74, ¶ 330.  These allegations are conclusory.  Moreover, these allegations do not show that Chief Pazen or Commander Phelan created, promulgated, or implemented such policies.

Finally, even if the Court accepts Mr. Driscoll's argument that the allegations in his complaint regarding police conduct towards protestors other than Mr. Driscoll establish that Denver police officers had a custom of using excessive force against protestors, Docket No. 111 at 6, the second amended complaint contains no allegations

46

that demonstrate that Chief Pazen or Commander Phelan established or utilized such an unconstitutional custom. *Dodds*, 614 F.3d at 1199. More importantly, the allegations in the second amended complaint do not establish that Chief Pazen or Commander Phelan were aware of such a custom at the time Mr. Driscoll was shot in the forehead. The only allegations in the second amended complaint that would give rise to the inference that Chief Pazen or Commander Phelan authorized or ratified the unconstitutional uses of force by police at the protests such that they were responsible for a policy of using such force are that Chief Pazen and Commander Phelan were "made aware" of police conduct, *see*, *e.g.*, Docket No. 94 at 80, ¶ 380, and that they were shown videos of police uses of force. *Id.* at 14, ¶ 44. These allegations do not identify when or how Chief Pazen and Commander Phelan were made aware of the unconstitutional actions of their subordinates. Moreover, the allegations do not identify when Chief Pazen and Commander Phelan were shown videos of police or what was on the videos, such that these videos would have put them on notice that their subordinates had a custom of using unconstitutional force. For all these reasons, the allegations in Mr. Driscoll's second amended complaint fail to demonstrate Chief Pazen's and Commander Phelan's personal involvement in the violations of Mr. Driscoll's constitutional rights.

### ii.    Causation

"The second element requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Est. of Booker*, 745 F.3d at 435 (citation and quotations omitted). Mr. Driscoll's second amended complaint contains no allegations

regarding any actions that Chief Pazen or Commander Phelan took beyond the conclusory allegation that they supervised and directed all police action at the protest. For this reason, Mr. Driscoll's second amended complaint fails to establish causation as to Chief Pazen or Commander Phelan.[13]  *Neal*, 2009 WL 2852406, at *5 (allegation "that Cobb directed and supervised all the mass searches" was insufficient because "[t]he causal link between Cobb and the claimed constitutional violation must be specifically alleged").

### iii.    State of Mind

The third element of a supervisory liability claim "requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind," which "can be no less than the mens rea required" of the subordinates to commit the underlying constitutional violation.  *Est. of Booker*, 745 F.3d at 435 (citations omitted).  Mr. Driscoll

---

[13] Some courts outside of the Tenth Circuit have found that "a supervisor may cause violations when he or she has actual knowledge of past constitutional violations being carried out by a subordinate, and does nothing to stop future occurrences." *Dodds*, 614 F.3d at 1212 (Tymkovich J., concurring); *see also Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (supervisory liability can result from "failure to act on information indicating that unconstitutional acts were occurring"); *Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir. 2001) (liability is appropriate for supervisors who "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see"); *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999) (widespread abuse that is "obvious, flagrant, rampant and of continued duration" can lead to supervisory liability if the supervisor does not act to correct these behaviors); *Castillo v. Bobelu*, 1 F. Supp. 3d 1190, 1204 (W.D. Okla. 2014), *aff'd in part, appeal dismissed in part sub nom. Castillo v. Day*, 790 F.3d 1013 (10th Cir. 2015), and *aff'd sub nom. Castillo v. Jones-Cooper*, 660 F. App'x 614 (10th Cir. 2016) (unpublished) ("The court agrees with plaintiffs that if a supervisor knows about misconduct and fails to act or is aware of a significant risk and does not alleviate it, she can be held liable under § 1983").  Even if the Court were to find that actual knowledge of past constitutional violations and a failure to act on such knowledge could demonstrate causation, for the reasons discussed above, the allegations in Mr. Driscoll's second amended complaint do not establish that Chief Pazen or Commander Phelan had actual knowledge of past constitutional violations at the time Mr. Driscoll was shot in the forehead.

provides no argument as to whether Chief Pazen and Commander Phelan had the state of mind necessary to sustain a claim of supervisory liability as to each of his claims. The allegations in Mr. Driscoll's second amended complaint do not provide any details as to what Chief Pazen and Commander Phelan knew at the time Mr. Driscoll was shot in the forehead.  Without any non-conclusory allegations regarding what Chief Pazen and Commander Phelan knew, Mr. Driscoll cannot show that Chief Pazen and Commander Phelan took actions with the state of mind required to commit the underlying constitutional violation.  *Est. of Booker*, 745 F.3d at 435.

Thus, even if the Court were to consider whether the allegations in Mr. Driscoll's second amended complaint plausibly allege that Chief Pazen and Commander Phelan violated his constitutional rights, the Court would find that Mr. Driscoll's complaint fails to sufficiently allege the elements of a claim for supervisory liability because it does not plausibly allege Chief Pazen's and Commander Phelan's personal involvement, a causal link between their actions and the violation of Mr. Driscoll's constitutional rights, or Chief Pazen's and Commander Phelan's state of mind.[14]

---

[14] Mr. Driscoll argues that he has adequately alleged supervisory liability as to Chief Pazen and Commander Phelan based on their failure to train their subordinates. Docket No. 111 at 12–13 (citing *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991); *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016)).  In *Houston*, the Tenth Circuit stated that "a supervisor or the municipality may be liable in a § 1983 action brought for excessive use of force by the police 'where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable.'"  *Houston*, 932 F.2d at 888 (alterations omitted) (quoting *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988)).  As discussed, Mr. Driscoll's second amended complaint contains no allegations as to what training Denver police officers received. As such, the second amended complaint does not demonstrate that there was "essentially a complete failure to train."  *Id.*  Therefore, Mr. Driscoll has also failed to state a claim against Chief Pazen and Commander Phelan based on a failure to train their subordinates.

IV.    **CONCLUSION**

Therefore, it is

**ORDERED** that the Motion to Dismiss Second Amended Complaint on Behalf of Denver, Chief Pazen, and Commander Phelan [Docket No. 99] is **GRANTED**.  It is further

**ORDERED** that Michael Driscoll's sixth claim for relief is **DISMISSED with prejudice**.  It is further

**ORDERED** that Michael Driscoll's first, second, third, fourth, and fifth claims for relief against defendants Paul Pazen and Patrick Phelan are **DISMISSED with prejudice**.  It is further

**ORDERED** that defendants Paul Pazen and Patrick Phelan are terminated from this case.  It is further

**ORDERED** that the Motion to Dismiss Plaintiff's Second Amended Complaint [Docket No. 100], and Defendant Timothy Hyatt's Motion to Dismiss Plaintiff's Second Amended Complaint [Docket No. 102] are **GRANTED**.  It is further

**ORDERED** that Michael Driscoll's first, second, third, fourth, and fifth claims for relief against defendants Rick Eberharter, Timothy Hyatt, and Christopher Cochran are **DISMISSED with prejudice**.  It is further

**ORDERED** that defendants Rick Eberharter, Timothy Hyatt, and Christopher Cochran are terminated from this case.

DATED September 30, 2024.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge