IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02866-PAB-NRN

MICHAEL DRISCOLL,

     Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, a municipal entity,

     Defendant.

---

## ORDER

---

     The matters before the Court are the Motion for Reconsideration of Order
Dismissing Failure to Train Claims Against Defendant Denver [Docket No. 234] and
Defendants' Motion for Summary Judgment [Docket No. 189].  The Court has
jurisdiction pursuant to 28 U.S.C. § 1331.

I.    **BACKGROUND**

    A.  <u>**Procedural History**</u>

     Mr. Driscoll filed his original complaint on October 25, 2021.  Docket No. 1.  Mr.
Driscoll brought five claims of relief against the City and County of Denver ("Denver"),
Paul Pazen, the Chief of the Denver Police Department ("DPD"), Patrick Phelan a
commander in DPD, and ten John Doe defendants based on a head injury he sustained
while protesting in response to the murder of George Floyd ("the protests") in the spring
of 2020 in Denver, Colorado.  *Id.* at 39–51, ¶¶ 151–260.  These claims included a
Fourth Amendment claim for excessive force, a Fourteenth Amendment claim for
excessive force, a First Amendment claim for violating Mr. Driscoll's rights of free

speech and assembly, a First Amendment retaliation claim, and a Fourteenth Amendment due process claim. *Id.*

On February 28, 2023, Mr. Driscoll filed his first amended complaint. Docket No. 40. The amended complaint brought the same five claims for relief as the initial complaint. *See id.* at 68–79, ¶¶ 283–378. However, Mr. Driscoll's amended complaint substituted the ten John Doe defendants for various named police officers, including DPD officers Timothy Hyatt, Rick Eberharter, and Christopher Cochran. *Id.* at 1. Additionally, the amended complaint added factual allegations regarding other interactions between police and Mr. Driscoll throughout the protests. *See id.* at 34–58, ¶¶ 84–199. The amended complaint added a sixth claim for relief, namely, a Fourth Amendment failure to train or supervise claim against Denver, Chief Pazen, and Commander Phelan. *Id.* at 79–81, ¶¶ 379–92.

On October 23, 2023, Mr. Driscoll filed the second amended complaint, which is virtually identical to the first amended complaint. Docket No. 94. Denver, Chief Pazen, Commander Phelan, Officer Hyatt, Officer Eberharter, and Officer Cochran filed motions to dismiss Mr. Driscoll's second amended complaint. Docket Nos. 99, 100, 102. On July 19, 2024, while the motions to dismiss were pending, defendants filed a motion for summary judgment. Docket No. 189. On September 6, 2024, Mr. Driscoll responded to the motion for summary judgment, Docket No. 209, and defendants replied on October 4, 2024. Docket No. 230.

On September 30, 2024, the Court granted defendants' motions to dismiss. Docket No. 228 at 50. As to Officers Hyatt, Eberharter, and Cochran, the Court determined that the allegations in Mr. Driscoll's second amended complaint did not

relate back to the allegations in his original complaint.  *Id.* at 13–19.  The Court found

that, because the allegations did not relate back to the original complaint, Mr. Driscoll's

claims against the officers were barred by the applicable statute of limitations, and

dismissed Officers Hyatt, Eberharter, and Cochran from the case.  *Id.* at 23–24.  The

Court also dismissed Chief Pazen and Commander Phelan because the Court

concluded that they were entitled to qualified immunity.  *Id.* at 43.  Finally, the Court

dismissed Mr. Driscoll's failure to train claim against Denver.  *Id.* at 30–31.  The Court

found that, for Mr. Driscoll to state a claim for municipal liability under *Monell v. Dep't of*

*Soc. Servs. of N.Y.,* 436 U.S. 658, 692 (1978), based on Denver's failure to train its

officers, Mr. Driscoll was required to allege how the officers were trained and how the

training was deficient.  Docket No. 228 at 28.  The Court found that Mr. Driscoll's

amended complaint contained no allegations regarding how Denver officers were

trained.  *Id.* at 30.  Moreover, the Court found that the amended complaint did not

plausibly allege that the circumstances of the protests were recurring such that Denver's

training of its officers presented an obvious potential for constitutional violations.  *Id.*

On October 28, 2024, Mr. Driscoll filed a motion asking the Court to reconsider

its order dismissing his failure to train claim against Denver.  Docket No. 234.  Denver

responded, Docket No. 239, and Mr. Driscoll replied.  Docket No. 241.

**B.  Undisputed Facts[1]**

The 2020 George Floyd protests were unprecedented with respect to the number

---

[1] Because the motion for summary judgment was filed before the Court ruled on
the motion to dismiss, many of the parties' factual disputes are no longer relevant to the
resolution of this case.  The Court will discuss only those facts, disputed and
undisputed, that are relevant to the matters still before the Court.  The following facts
are undisputed unless indicated otherwise.

of attendees, the level of violence, and the types of objects used by crowd members to

commit violence.  Docket No. 189 at 7, ¶ 33.  Throughout the protests, police used tear

gas and fired at protesters with projectiles and flashbangs.[2]  Docket No. 223-1[3] at 12,

¶ 1.

---

[2] In his statement of additional disputed facts, Mr. Driscoll states that police
"consistently and indiscriminately gassed, targeted and fired at protesters with
projectiles and flashbangs, without warning, justification, or provocation."  Docket No.
223-1 at 12, ¶ 1.  Mr. Driscoll supports his assertion with a video submitted to the Court
on a thumb drive that is a compilation of videos showing police using force against
protesters, including using tear gas, batons, flashbangs, and various types of
projectiles.  *Id*. (citing Ex. 83).  The Court finds that, while the video does show over
thirty uses of force by police, the video does not show that each of these uses of force
was without warning, justification, or provocation.  Mr. Driscoll asserts in his statement
of additional disputed facts that "DPD and mutual aid partners also aimed for protester
heads."  *Id*., ¶ 2.  Mr. Driscoll attaches photographs of injuries to people's heads.  *Id*.
(citing Exs. 246–63).  Mr. Driscoll's exhibits do not demonstrate how the individuals
depicted in the photographs sustained their injuries.  "It is well settled in this circuit" that
courts "can consider only admissible evidence in reviewing . . . summary judgment."
*Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995).  "This does not
mean that evidence must be submitted 'in a form that would be admissible at trial.'"
*Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Celotex Corp. v.
Catrett,* 477 U.S. 317, 324 (1986)).  Nonetheless, "the content or substance of the
evidence must be admissible."  *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016)
(citation omitted).  The photographs lack any foundation and do not properly support Mr.
Driscoll's assertion that Denver police officers and mutual aid partners aimed at
protester heads.  *See Valdez v. Universal Logistics of Virginia, LLC*, No. 23-cv-01015-
PAB-KAS, 2024 WL 4346407, at *8 (D. Colo. Sept. 30, 2024) (finding fact unsupported
at summary judgment because evidence lacked foundation); *see also Johnson v.
Chilcott*, 658 F. Supp. 1213, 1221–22 (D. Colo. 1987) ("This motion to strike is granted
for purposes of this summary judgment motion, because the plaintiff has not offered
sufficient evidence to lay an adequate foundation for these documents.").  Many of
these images appear in Mr. Driscoll's second amended complaint and are accompanied
by allegations about how the persons sustained their injuries.  *See, e.g.*, Docket No. 94
at 18–19, ¶ 67.  However, the allegations in Mr. Driscoll's amended complaint regarding
these individuals are not based on his personal knowledge and the unsupported
allegations cannot supply the necessary foundation at summary judgment.

[3] Mr. Driscoll filed his response on September 6, 2024.  Docket No. 209.  On
September 9, 2024, Mr. Driscoll filed a notice of errata that indicates that his original
response contained several clerical errors in citations that refer to the incorrect exhibit
numbers.  Docket No. 223 at 1.  Mr. Driscoll attached an amended copy of his response

Pursuant to the Incident Command System, one individual had overall authority to manage the protests. Docket No. 189 at 9, ¶ 46. Commander Phelan was Incident Commander for the protests. *Id.*, ¶ 48. As Incident Commander, Commander Phelan made final decisions in directing police response to the protesters and directed officers to use gas against protesters. Docket No. 223-1 at 18, ¶ 32. Commander Phelan's authorization was generally required for the use of force. *Id.* Denver provided rules of engagement to mutual-aid agencies,[4] and its policy was to allow outside agencies to use their own policies. *Id.* at 19, ¶ 37.

The Denver Police Department created and implemented an operations plan for each protest day from May 28 to June 2, 2020. Docket No. 189 at 9, ¶ 49. Commander Phelan, or a designee, conducted daily briefings with all Denver police command staff and supervisors, including supervisors from responding agencies. *Id.* The briefings explained the operations plan for the day and areas where officers and resources would be deployed. *Id.* The May 31 operations plan states that the overall response would be in accordance with Denver's crowd management manual and that "[a]ny officer deploying chemical agents or using force during the events will adhere to normal use of force reporting requirements." *Id.* at 8, ¶ 38. Supervisors from the Denver Police Department and responding agencies were instructed by Denver command staff that

---

that corrects these clerical errors. Docket No. 223-1. The Court will cite the amended response.

[4] Although both parties refer to mutual aid partners and mutual aid agencies, neither party defines these entities. It is an undisputed fact that, "[s]tarting on May 29, DPD requested assistance from multiple neighboring jurisdictions" and that "[o]fficers from other jurisdictions came to aid the Denver protest response." Docket No. 189 at 8, ¶ 40. The Court assumes that the police agencies of the neighboring jurisdictions who responded to Denver request for assistance are mutual aid agencies.

dispersal orders/warnings or other instructions were to be given, if time and circumstances allowed, before deploying gas or less-lethal munitions.[5]  *Id.* at 7, ¶ 34. During the protests, Commander Phelan never directed the use of a 40mm or pepper ball system.[6]  *Id.* at 9, ¶ 50.  Commander Phelan authorized the use of CS gas[7] on May 28, 2020.  Docket No. 223-1 at 12, ¶ 4.

The Jefferson County Regional Special Weapons and Tactics Team ("Jeffco SWAT") is made up of officers from Arvada, Golden, and the Jefferson County Sheriff's Department.  Docket No. 189 at 13, ¶ 91.  Jeffco SWAT responded to Denver as a mutual aid partner on May 31, 2020.  *Id.* at 14, ¶ 92.  Jeffco SWAT was assigned as an immediate reaction team to respond to locations where a police presence was needed. *Id.*, ¶ 95.  Jeffco SWAT relied on their own standard protocols and made decisions regarding uses of force based on their own assessment of the circumstances.[8]  *Id.*,

---

[5] Mr. Driscoll disputes this fact by arguing that Denver provided inadequate training on the use of less lethal munitions.  Docket No. 223-1 at 5, ¶ 34.  The denial is unresponsive to the asserted undisputed fact.  Therefore, it is deemed an undisputed fact that Denver Police Department supervisors and responding agencies were instructed by command staff that dispersal orders/warnings or other instructions were to be given before deploying less lethal munitions.

[6] Mr. Driscoll denies this fact by stating that Commander Phelan directed officers to use tear gas on protesters and that he made final decisions in managing the protest. Docket No. 223-1 at 6, ¶ 50.  Mr. Driscoll's denial is unresponsive to Denver's asserted undisputed fact that Commander Phelan never directed the use of 40mm or pepper ball systems.  Therefore, the Court deems this fact admitted.

[7] It is an undisputed fact that a "CS canister contains a cyanocarbon and is used as a crowd control device.  Exposure causes a burning sensation and tearing of the eyes."  Docket No. 189 at 5, ¶ 14.

[8] Mr. Driscoll asserts in his statement of additional disputed facts that "Denver was responsible for the excessive use of force by mutual aid agencies, including use of less lethal shotguns approved by Pazen or Phelan."  Docket No. 223-1 at 18–19, ¶ 33. Mr. Driscoll cites to the deposition testimony of Commander Michael O'Donnell, who appears to be a Denver employee.  Docket No. 220-5 at 13, 60:13–18 ("As the city's representative regarding the city's crowd management policy").  Commander O'Donnell testified that it was the policy of the Denver Police Department at the time of the

¶ 96.  On May 31, 2020, Sargent Robert Stack was assigned as a liaison with Jeffco SWAT.[9]  *Id.*, ¶ 99.

On the evening of May 31, 2020, Mr. Driscoll and other protesters went to 13th Street and Cherokee Street, the area of the DPD headquarters, also known as the police administration building.  *Id.* at 15, ¶ 107.  At 10:00 p.m. on May 31, 2020, in response to the group of protesters turning west on 13th Street, Commander Phelan directed "870 with JeffCo" to "stop them from coming down."  Docket No. 223-1 at 22, ¶ 66.  From 10:01–10:03 p.m., referring to the same group of protesters, Commander Phelan gave Denver District 2 and 3 tactical teams and Denver Metro SWAT multiple directions to go to the police administration building to "stop them."  *Id.*, ¶ 67.  At approximately 10:03 p.m., a large group of protesters, including Mr. Driscoll, arrived at

---

protests that officers, including from other agencies, could not use bean bag shotguns without approval from the incident commander.  *Id.*, 60:1–12.  However, Commander O'Donnell also testified that he was unaware of whether Chief Pazen or Commander Phelan discussed this policy with other agencies and that, to his knowledge, no bean bag shotguns were deployed during the protests.  *Id.*  Mr. Driscoll cites deposition testimony by Commander Phelan in which he states that he provided daily briefings to other agencies which gave "the same direction and guidance and rules of engagement" to outside agencies.  Docket No. 220-6 at 20, 25–27, 42:1–25, 93:1–95:25.  However, Commander Phelan also testified that it was Denver's policy to allow outside agencies to use their own policies and procedures with respect to the use of less lethal weapons.  *Id.* at 27, 95:11–16.  The Court finds that Mr. Driscoll's evidence does not support his assertion that "Denver was responsible for the excessive use of force by mutual-aid agencies" given that it is an undisputed fact that outside agencies used their own procedures and policies regarding use of force.  Therefore, Mr. Driscoll does not raise a genuine dispute of material fact on this issue.  Moreover, to the extent that Commander O'Donnell's testimony supports the proposition that Commander Phelan's authorization was required before using beanbag shotguns, Mr. Driscoll produces no evidence that he was hit with a bean bag or that bean bags were ever deployed at the protests.

[9] The Court notes that, in his deposition testimony, Drew Williams, a member of the Jefferson Court SWAT team, stated that his team was assigned "a liaison from Denver PD that accompanied us throughout each of the operations we were a part of." Docket No. 190-4 at 5:3–6.

the intersection of Cherokee Street and 13th Street.  *Id.*, ¶ 68.   At the same time,

Commander Phelan told the officers going to the police administration building to "see

what you can do when you get there."  *Id.*, ¶ 69.  Jeffco SWAT officers formed a

skirmish line down the street from the crowd of protesters.  Docket No. 189 at 15, ¶ 110.

Jeffco SWAT officers deployed less-lethal munitions at the protesters at around 10:10

p.m.  *Id.*, ¶ 112.  Mr. Driscoll was struck in the head by an object.  *Id.* at 16, ¶ 115.  Mr.

Driscoll did not see the object that struck him in the head.  *Id.*, ¶ 116.  Prior to being

struck, Mr. Driscoll did not engage in violence, property destruction, or illegal behavior

other than violating Denver's curfew.[10]  Docket No. 223-1 at 24, ¶ 88.

Commander Phelan did not order any use of force at 13th Street and Cherokee

Street after 10:00 p.m. on May 31, 2020.[11]  Docket No. 189 at 10, ¶ 51.  At no time on

the night of May 31, 2020 did Denver command staff direct deployment of any weapons

---

[10] In his statement of additional disputed facts, Mr. Driscoll asserts that, "[p]rior to
being struck, Mr. Driscoll never engaged in any violence, property destruction, or other
illegal behavior."  Docket No. 223-1 at 24, ¶ 88.  Denver denies that Mr. Driscoll did not
engage in illegal behavior because Mr. Driscoll's presence on the street at that time
violated Denver's curfew.  Docket No. 230 at 12, ¶ 89.  Denver also points to evidence
that Mr. Driscoll kicked an object at a police line earlier in the evening and at a different
location.  *Id.*; Docket No. 189 at 13, ¶ 84.  Denver otherwise admits this fact.  Docket
No. 230 at 12, ¶ 89.  The Court finds that it is an undisputed fact that Mr. Driscoll did not
engage in any violence, property destruction, or illegal behavior other than being out
past curfew while protesting at the intersection of 13th Street and Cherokee Street.
[11] Mr. Driscoll denies this fact, stating that Commander Phelan directed officers
to stop protesters.  Docket No. 223-1 at 6, ¶ 51.  Mr. Driscoll cites to Exhibit 101.  *Id.*.
Exhibit 101 is a ten-minute video that appears to be a video recording of events on May
31, 2020 taken from a police helicopter with corresponding communications over the
police radio.  At minute 3:41 on the video, a voice asks officers on the ground to stop a
group of protesters from proceeding north on Cherokee.  The exhibit does not support
the proposition that Commander Phelan ordered any use of force at 13th Street and
Cherokee Street.  The Court deems this fact undisputed.

system by Jeffco SWAT.[12]  *Id.* at 14, ¶ 102.  Sargent Stack never directed Jeffco SWAT

to deploy force.[13]  *Id.*, ¶ 103.

## II.  LEGAL STANDARD

### A.  Motion for Reconsideration

The Federal Rules of Civil Procedure do not specifically provide for motions for

reconsideration.  *See Hatfield v. Bd. of Cnty. Comm'rs for Converse Cnty.*, 52 F.3d 858,

861 (10th Cir. 1995).  Instead, motions for reconsideration fall within a court's plenary

power to revisit and amend interlocutory orders as justice requires.  *See Paramount*

*Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1090 (10th Cir. 1980) (citing

Fed. R. Civ. P. 54(b)); *see also Houston Fearless Corp. v. Teter*, 313 F.2d 91, 92 (10th

Cir. 1962).  In order to avoid the inefficiency that would attend the repeated re-

adjudication of interlocutory orders, judges in this district have imposed limits on their

broad discretion to revisit interlocutory orders.  *See, e.g., Montano v. Chao*, No. 07-cv-

00735-EWN-KMT, 2008 WL 4427087, at *5–6 (D. Colo. Sept. 28, 2008) (applying Rule

60(b) analysis to the reconsideration of interlocutory order); *United Fire & Cas. Co. v.*

*McCrerey & Roberts Constr. Co.*, No. 06-cv-00037-WYD-CBS, 2007 WL 1306484, at

*1-2 (D. Colo. May 3, 2007) (applying Rule 59(e) standard to the reconsideration of the

duty-to-defend order).  Regardless of the analysis applied, the basic assessment tends

---

[12] Mr. Driscoll denies this fact, arguing that Jeffco SWAT was "operating under Incident Command."  Docket No. 223-1 at 10, ¶ 102.  Mr. Driscoll provides no support for the proposition that Denver command staff directed Jeffco SWAT to deploy any weapon systems.  Therefore, this fact is deemed undisputed.

[13] Mr. Driscoll denies this fact.  Docket No. 223-1 at 10, ¶ 103.  Mr. Driscoll cites to a Golden Police Department incident report describing events on May 29, 2020.  Docket No. 220-3 at 3.  The report suggests that a Denver police lieutenant instructed Golden police officer Marck Donohue to deploy tear gas on a crowd of protesters.  *Id.* The incident report does not create a dispute of fact as to whether Sargent Stack ordered Jeffco SWAT to deploy force.

to be the same: courts consider whether new evidence or legal authority has emerged

or whether the prior ruling was clearly in error.  *See Echon v. Sackett*, No. 14-cv-03420-

PAB-NYW, 2019 WL 8275344, at *2 (D. Colo. Feb. 12, 2019); *cf. Alpenglow Botanicals,*

*LLC v. United States*, 894 F.3d 1187, 1203 (10th Cir. 2018) ("[A] motion for

reconsideration is appropriate where the court has misapprehended the facts, a party's

position, or the controlling law.").  Motions to reconsider are generally an inappropriate

vehicle to advance "new arguments, or supporting facts which were available at the time

of the original motion."  *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th

Cir. 2000).  Instead, motions for reconsideration will be granted where there is "(1) an

intervening change in the controlling law, (2) new evidence previously unavailable, [or]

(3) the need to correct clear error or prevent manifest injustice."  *Id.*

### B. <u>Motion for Summary Judgment</u>

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if,

under the relevant substantive law, it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary judgment*.*

*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

A movant who bears the burden at trial must submit evidence to establish the

essential elements of its claim or affirmative defense.  *Harper v. Mancos Sch. Dist. RE-*

*6*, 837 F. Supp. 2d 1211, 1217 (D. Colo. 2011).  By contrast, where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. Of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

## III.   ANALYSIS

### A.  Motion to Reconsider

Mr. Driscoll asks the Court to reconsider its order granting Denver's motion to dismiss Mr. Driscoll's failure to train claim, in light of the final judgment entered in *Epps v. City and County of Denver*, No. 20-cv-1878-RBJ, Docket No. 529[14] (D. Colo. Aug. 29, 2024).  Docket No. 234 at 2.  In *Epps*, sixteen plaintiffs brought claims against various law enforcement officers and government entities, including Denver, for injuries the plaintiffs sustained during the George Floyd protests in Denver.  *See Epps v. City and*

---

[14] The Court will refer to docket entries in the *Epps* case by the corresponding *Epps* Docket Number, e.g. *Epps* Docket No. 1.

*County of Denver,* 20-cv-01878-RBJ, 2022 WL 21727363, at *1–10 (D. Colo. Sept. 23,

2022), *Epps* Docket No. 248.  The case went to trial between March 7, 2022 and March

25, 2022.  *Epps* Docket Nos. 314, 341.  The jury reached a verdict for plaintiffs.  *Epps*

Docket No. 343.  As part of the verdict form, the jury answered interrogatories

identifying under which theory it found Denver liable.  *See id.*  The jury found that

Denver was liable under a "Failure to Train" theory for several of plaintiffs' claims.[15]  *Id.*

On August 19, 2024, the court entered final judgment in the *Epps* case.  *Epps* Docket

No. 527.[16]

Mr. Driscoll maintains that the Court should reconsider its order granting

Denver's motion to dismiss Mr. Driscoll's failure to train claim because the *Epps* jury

specifically found that Denver was liable based on a failure to train theory.  Docket No.

234 at 5.  As such, Mr. Driscoll maintains that Denver is now barred under the doctrine

of issue preclusion to relitigate its failure to properly train its officers.  *Id.*

Under the doctrine of issue preclusion, "when an issue of ultimate fact has once

been determined by a valid and final judgment, that issue cannot again be litigated

between the same parties in any future lawsuit."  *Ashe v. Swenson*, 397 U.S. 436, 443

(1970).  "[I]ssue preclusion bars a party from relitigating an issue once it has suffered an

adverse determination on the issue, even if the issue arises when the party is pursuing

or defending against a different claim."  *Park Lake Res. Ltd. Liab. v. U.S. Dep't of Agr.*,

---

[15] The jury found that Elisabeth Epps had failed to prove her First Amendment
claim against Jonathan Christian and Denver.  *Epps* Docket No. 343 at 7–9.  However,
the jury found for Ms. Epps on her Fourth Amendment claim and found that Denver was
liable under a failure to train theory.  *Id.*
[16] The court entered an amended judgment on August 29, 2024.  *Epps* Docket
No. 529.  The amended judgment is not relevant to the Court's analysis.

378 F.3d 1132, 1136 (10th Cir. 2004) (citation omitted).  It is designed to prevent parties from wasting time and resources, and to discourage losing parties from shopping around for a different court.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 140 (2015).  In general, issue preclusion applies when: (1) the issue previously decided is identical to the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party to, or in privity with, a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.  *Park Lake*, 378 F.3d at 1136.

Mr. Driscoll argues that, "in finding against Denver on the failure to train, the jury necessarily determined that each of the four elements of failure to train had been met – including that Denver had deficient training that related to the constitutional violations and that Denver was deliberately indifferent."  Docket No. 234 at 7.  Mr. Driscoll claims that "[p]laintiff in this case alleges the same thing."  *Id.* at 5.  In his reply, Mr. Driscoll directs the Court to the proceedings in *Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 4929272, at *1 (D. Colo. Dec. 2, 2024).  Docket No. 241 at 1.  In *Cousik*, a different George Floyd protest case, thirteen plaintiffs brought claims against various officers, law enforcement agencies, and Denver, including a failure to train claim against Denver.  *See Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 896755, at *1, *18 (D. Colo. Mar. 1, 2024).  Judge Wang granted Denver summary judgment on the plaintiffs' failure to train claim, finding that the plaintiffs had failed to produce evidence that Denver had been deliberately indifferent to the plaintiffs' rights while training its officers.  *Id.* at *19.

Judge Wang later reconsidered her summary judgment order.  *See Cousik,* 2024 WL 4929272, at *3.  The *Cousik* plaintiffs argued that the final judgment in *Epps* changed the circumstances of the case such that the court should reconsider its summary judgment order and find that issue preclusion barred Denver from arguing that it had adequately trained its officers at trial.  *See id.*  Judge Wang found that, although her summary judgment motion had concluded that no reasonable jury could find that Denver had been deliberately indifferent, the *Epps* jury had relied on substantially similar evidence to reach the opposite conclusion.  *See id.* at *5 ("plaintiffs direct the Court to evidence presented in the *Epps* case that they believe supported the *Epps* plaintiffs' failure-to-train theories on crowd control and less-lethal weapons, and much of this evidence overlaps with evidence cited by Plaintiffs at summary judgment in this case" (citations omitted)).  Although Judge Wang noted that she "could not locate any authority discussing the propriety of issue preclusion in a case with this particular procedural posture," she concluded that the plaintiffs had demonstrated that the court should reconsider its summary judgment order.  *Id.* at *3.  Moreover, she found that, on reconsideration, issue preclusion barred Denver from arguing that it had adequately trained its officers.  *Id.* at *7 (Plaintiffs "will not be required to prove at trial (a) a failure to train with respect to crowd management or the use of less-lethal weapons or (b) that Denver was deliberately indifferent to this lack of training.  Plaintiffs will still be required to prove (c) that each individual Plaintiff's constitutional rights were violated by Denver officers; and (d) Denver's conduct caused the violation of each individual Plaintiff's constitutional rights.").

The Court finds that Mr. Driscoll has failed to demonstrate that the Court should reconsider its order granting Denver's motion to dismiss. Mr. Driscoll does not identify an intervening change in the controlling law, new evidence previously unavailable, or a clear error in the Court's order such that reconsideration is appropriate in this case. *Servants of the Paraclete*, 204 F.3d at 1012 (a motion for reconsideration will be granted where there is "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice").

First, Mr. Driscoll does not argue that the final judgment in *Epps* constitutes a change in controlling law. *See* Docket No. 234. Instead, Mr. Driscoll maintains that, at the time the final judgment was entered, the *Epps* verdict precluded Denver from further litigating the issue of whether it had adequately trained its officers before the protests. Although Mr. Driscoll claims that he now can satisfy an element of issue preclusion which he could not do before the *Epps* verdict, he provides no support for the proposition that the final judgment in *Epps* constitutes a change in controlling law under Tenth Circuit authorities. *See Servants of the Paraclete*, 204 F.3d at 1012. Moreover, Judge Wang's order in *Cousik* on the plaintiffs' motion to reconsider does not constitute a change in controlling law. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Thus, Mr. Driscoll does not satisfy the first factor for reconsideration.

Second, the final judgment in *Epps* does not constitute evidence that was previously unavailable to Mr. Driscoll. The judgment is not "evidence" within the

meaning of *Servants of the Paraclete*, 204 F.3d at 1012. Rather, it is more akin to "controlling law," which argument the Court has already rejected. Moreover, even if the judgment in *Epps* does constitute "evidence," Mr. Driscoll had the ability to make his issue preclusion argument in anticipation of judgment entering in *Epps*. In fact, Mr. Driscoll did reference the *Epps* jury verdict in his response to Denver's motion to dismiss. *See* Docket No. 111 at 2 ("Earlier this year, a federal jury found the City and County of Denver liable for its officers' excessive and retaliatory use of pepper-ball guns and other less lethal weapons against each of the 11 plaintiffs."). However, the *Epps* verdict was irrelevant to the question of whether Mr. Driscoll had plausibly stated his claims.

Finally, Mr. Driscoll identifies no error in the Court's prior order. *See* Docket No. 234. Mr. Driscoll's argument must therefore be that manifest injustice would occur if the Court denied his motion to reconsider. The Court perceives no injustice. Mr. Driscoll has not shown that the motion to dismiss was wrongly decided. This case is distinguishable from *Cousik* based on the cases' different procedural postures. In *Cousik*, Judge Wang reconsidered her March 1, 2024 determination that the plaintiffs' evidence was insufficient for a jury to conclude that Denver was liable because final judgment in *Epps* was entered on August 19, 2024 and the jury in *Epps* held Denver liable on substantially similar evidence. *Cousik*, 2024 WL 4929272, at *5. Here, the issue presented to the Court on Denver's motion to dismiss was the sufficiency of Mr. Driscoll's allegations in the second amended complaint. *See* Docket No. 228 at 25. In considering the issue, the Court was limited to the allegations in the second amended complaint. *Dobson v. Anderson*, 319 F. App'x 698, 701 (10th Cir. 2008) (unpublished)

("when considering a Rule 12(b)(6) motion, a court can only consider the facts alleged in the complaint").  The allegations in Mr. Driscoll's second amended complaint have not changed and are deficient for the reasons discussed in the Court's order granting the motion to dismiss.  *See* Docket No. 228 at 25–31.  Mr. Driscoll's second amended complaint fails to state a failure to train claim against Denver, and the claim was properly dismissed.  The judgment in *Epps* cannot have preclusive effect on claims that were dismissed on the pleadings.  The motion to reconsider is denied.

### B. <u>Motion for Summary Judgment</u>

Mr. Driscoll brings his constitutional claims against Denver under 42 U.S.C. § 1983.  *See* Docket No. 94 at 68–79.  Municipalities may not be sued under § 1983 on a theory of respondeat superior for the actions of their employees.  *Monell,* 436 U.S. at 692.  Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id*. at 690.  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id*. at 694.

To prove his claim of municipal liability under § 1983, Mr. Driscoll must demonstrate (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to
> a widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or
> usage with the force of law; (3) the decisions of employees with final
> policymaking authority; (4) the ratification by such final policymakers of the
> decisions – and the basis for them – of subordinates to whom authority was
> delegated subject to these policymakers' review and approval; or (5) the failure to
> adequately train or supervise employees, so long as that failure results from
> 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Denver argues that Mr. Driscoll's claims fail because he cannot demonstrate that

a Denver police officer violated his constitutional rights or that a Denver policy or

custom was the moving force behind the alleged constitutional violation.  *See* Docket

No. 189 at 18–19, 35–38, 42–44.  As such, Denver asserts that Mr. Driscoll has failed to

demonstrate that Denver caused Mr. Driscoll's injuries.  *Id.* at 42 ("Plaintiff's causation

problems are substantial.").

Causation is an element of a § 1983 claim.  *Schneider v. City of Grand Junction

Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013) (citing *Martinez v. Carson,* 697 F.3d

1252, 1255 (10th Cir. 2012)).  While causation "is generally a question of fact for the

jury," "whether the plaintiff has presented sufficient evidence of causation to defeat a

motion for summary judgment is a legal question."  *Id.* (citations omitted).  "At summary

judgment, a court must ask 'whether there is evidence upon which a jury can properly

proceed to find a verdict.'"  *Valdez v. Macdonald*, 66 F.4th 796, 833 (10th Cir. 2023)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  "[T]o proceed

against the City," Mr. Driscoll "must present sufficient evidence to create a genuine

issue of material fact as to causation."  *Schneider*, 717 F.3d at 780 (citing *Monell,* 436

U.S. at 692 ("Congress did not intend § 1983 liability to attach where . . . causation was

18

absent.")).  In § 1983 cases, courts employ general tort principles of causation to determine whether a defendant's alleged constitutional violation caused the plaintiff's injury.  *Valdez*, 66 F.4th at 832 (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled in part on other grounds by Monell*, 436 U.S. 658); *see also Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (plaintiff must establish "cause in fact between the conduct complained of and the constitutional deprivation").  "General tort principles of causation provide that even where the defendant's conduct does not directly cause the plaintiff's injuries, the defendant can still be liable if his conduct was the 'proximate cause' of the injury."  *Gerovic v. City & Cnty. of Denver*, 2023 WL 2293518, at *17 (10th Cir. Mar. 1, 2023) (citing *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)).  "Proximate cause exists where the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights."  *Id.* (citation, quotation, and alterations omitted).

"Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  But where "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Id.* at 405; *see also Schneider*, 717 F.3d at 770.

The Court will first consider whether Mr. Driscoll has produced sufficient evidence to create a genuine issue of material fact as to whether a Denver employee

violated Mr. Driscoll's constitutional rights. The Court will then consider whether Mr.
Driscoll has demonstrated that Denver can be held liable for the actions of a
nonemployee acting as Denver's agent.

### 1. Municipal Employee

Denver maintains that a Jeffco SWAT officer fired the shot that injured Mr.
Driscoll, and Denver cannot be held liable for a Jeffco SWAT officer's actions.[17] Docket
No. 189 at 18 n.7. Moreover, Denver contends that Mr. Driscoll's claims are too
speculative to pass summary judgment because Mr. Driscoll does not know the identity
of the officer who shot him. *Id.* at 18–19.

Mr. Driscoll argues that he was shot by a Denver SWAT officer. Docket No. 223-
1 at 24, 28, ¶ 84. In his statement of additional disputed facts, Mr. Driscoll claims the
following series of events led to Mr. Driscoll's injuries: Both Jeffco SWAT and Denver
SWAT officers arrived at the police administration building by 10:06 p.m. *Id.* at 23,
¶¶ 72, 73. While Jeffco SWAT officers formed a skirmish line across Cherokee Street,
Denver SWAT[18] officers positioned themselves on top of the parking garage across the
street from the police administration building. *Id.*, ¶ 75. At 10:09 p.m., three Denver
SWAT officers walked down into the parking lot that separated the Denver SWAT

---

[17] Denver asserts that the only claim against Denver in Mr. Driscoll's second
amended complaint is his failure to train claim, which the Court dismissed. *See* Docket
No. 189 at 37 ("Plaintiff's only claim against Denver is a failure-to-train claim"). Denver
is incorrect. Each of Mr. Driscoll's first five claims is brought against every defendant.
*See* Docket No. 94 at 68–79. Mr. Driscoll's sixth claim was brought against Denver,
Commander Phelan, and Chief Pazen. *Id.* at 79. In dismissing Mr. Driscoll's sixth claim
for relief, the Court stated that it would not consider Denver's arguments to the extent
that the motion to dismiss was seeking to dismiss any other claim. Docket No. 228 at
26 n.6. Therefore, Mr. Driscoll's first five claims against Denver remain.
[18] Mr. Driscoll's statement of additional disputed facts uses the phrase "Metro
SWAT," "Denver SWAT," and "DPD SWAT" interchangeably. Docket No. 223-1 at 23–
24, ¶¶ 73, 81, 82.

officers on top of the garage from the crowd of protesters.  *Id.*, ¶ 77.  These Denver

SWAT officers threw an explosive munition at one of the protesters who was on a bike.

*Id.*, ¶ 78.  Around that time, Denver SWAT requested more officers be sent to the

intersection of 13th Street and Cherokee Street.  *Id.* at 24, ¶ 82.  Several officers began

shooting munitions into the crowd of protesters, and Mr. Driscoll was struck in the head

with ammunition fired by a Denver SWAT officer.  *Id.*, ¶¶ 84, 85.

      Mr. Driscoll supports his assertion that he was shot by a Denver police officer by

citing three pieces of evidence.  First, Mr. Driscoll cites a fourteen-minute video of the

events before Mr. Driscoll was struck in the head.  *Id.* at 23, 24, ¶¶ 79, 88 (citing Ex.

191).  The video appears to be taken from a camera mounted to a street light at the

intersection of 13th Street and Cherokee Street.  Ex. 191.  The video shows three police

formations.  In the bottom left corner of the video, there is a line of police behind a metal

fence.  In the middle of the video screen, there are police standing in a line across

Cherokee Street.  There are six police officers on the top right corner of the video

standing on top of a parking garage.  At minute 9:09 on the video, three of the police

officers on top of the parking garage move to the parking lot across from the protesters.

At minute 9:56, a small explosion of sparks and a cloud of smoke appears by protesters

who are standing in the parking lot.  At minute 10:06, a gas canister is thrown by police

from the skirmish line across Cherokee Street.  At this time, Mr. Driscoll is standing in

the middle of the crosswalk closest to the skirmish line between 13th Street and

Cherokee Street and can be seen holding a wooden sign.[19]  Mr. Driscoll is surrounded

---

[19] Exhibit 221 is a screen shot of the video in Exhibit 191.  Docket No. 220-21.
Mr. Driscoll identifies himself by drawing a red circle around a figure wearing all-black

by protesters.  At minute 10:08, Mr. Driscoll holds his hand up to his face.  At minute 10:10, the camera angle changes so that the camera is focused only on the protesters, with no police in the frame.  At minute 10:11, Mr. Driscoll bends at his waist and appears to be entirely covered by his wooden sign.

Mr. Driscoll's second piece of evidence is another fourteen-minute video which appears to be a video taken from a camera mounted to a street light at the intersection of 14th Street and Cherokee Street.  *See*, *e.g.*, Docket No. 223-1 at 23, ¶ 79 (citing Ex. 192).  At minute 7:45 on the video, ten police officers wearing black uniforms and helmets cross 14th Street towards 13th Street, heading south on Cherokee Street.  From minutes 9:50 to 10:00, in the top left corner of the video, a police officer crosses down an alley that is halfway between 14th Street and 13th Street on Cherokee Street.  The alley appears to be on the opposite side of the street from the police administration building, which would indicate that the police officer walking down the alley is headed in the direction of the parking garage.

Finally, Mr. Driscoll relies on a Denver police report by DPD officer Craig Moen. Docket No. 223-1 at 24, ¶ 85 (citing Docket No. 220-22).  Officer Moen states that, on May 31, 2020, he was assigned "to Detail 1 Bearcat team with Metro 3."  Docket No. 220-22 at 1.  Officer Moen reports that he was later "dispatched to HQ" and that he "fired at least one direct impact round from the 40mm at a male who was throwing objects at police."  *Id.* at 2.

---

clothing and holding a wooden sign.  *Id.*  Denver does not dispute that Mr. Driscoll properly identifies himself in the video.  *See* Docket No. 230 at 12, ¶ 84.

The Court finds that Mr. Driscoll's evidence, considered either individually or collectively, does not create a genuine issue of material fact that he was shot by a Denver police officer.  While Mr. Driscoll's video of the events at 13th Street and Cherokee Street does show there were officers positioned in the parking garage across the street, the video does not show identifiable indicators that the police positioned at the garage are DPD officers as opposed to Jeffco SWAT officers.  *See* Ex. 191. Second, even if the Court were to assume that the officers positioned at the garage were Denver employees, the video does not clearly show that any of the officers positioned at the garage and later in the parking lot aimed and fired their weapons at protesters.  Finally, even if the Court were to assume that these officers were DPD officers and assume that they fired their weapons at the crowd of protesters, there is no evidence that Mr. Driscoll was struck by a munition fired by one of these officers. Exhibit 191 shows Mr. Driscoll positioned towards the front of the crowd of protesters facing the Jeffco SWAT skirmish line.  Mr. Driscoll is surrounded by protesters, with more protesters between him and the officers in the parking lot than between him and the Jeffco SWAT skirmish line.  To conclude that Mr. Driscoll was shot by one of the three officers in the parking lot, as opposed to one of the fourteen officers in the skirmish line across Cherokee Street, would require a reasonable jury to engage in impermissible speculation.

Mr. Driscoll's other evidence does not provide a causal link between his head injuries and a Denver employee.  Exhibit 192 demonstrates that a police officer walked down an alley in the direction of the parking garage.  *See* Ex. 192.  The video contains no information as to when the video was taken.  However, even if the Court were to

assume that the video recording took place shortly before Mr. Driscoll was struck by a projectile and that the video shows a Denver SWAT officer approaching the garage, the evidence at most provides support for the proposition that Denver SWAT officers were present when Mr. Driscoll was shot.  Ex. 192.  It does not raise a genuine issue of material fact that a DPD officer fired a projectile that hit Mr. Driscoll.

Officer Moen's police report also does not create a genuine issue of material fact that a Denver officer shot Mr. Driscoll with a projectile.  The report states that Officer Moen "fired one direct impact round from the 40mm at a male who was throwing objects at police."  Docket No. 220-22 at 2.  It is an undisputed fact that, prior to being struck, Mr. Driscoll did not engage in violence or property destruction.  Docket No. 223-1 at 24, ¶ 88.  Moreover, nothing in the videos of the incident, or anything else in the record, suggests that Mr. Driscoll threw an object at police.  Mr. Driscoll provides no support for the proposition that he was the man at whom Officer Moen fired.

Mr. Driscoll cannot satisfy the causation element of his § 1983 claims, which are based on his injuries from being struck in the head by a projectile.  At most, Mr. Driscoll's evidence suggests that Denver police officers were present and that either a Jeffco SWAT officer or a Denver police officer fired the projectile that injured him.  However, this is insufficient for Mr. Driscoll's claims against Denver to proceed based on a theory that he was injured by a Denver police officer.  *See Valdez*, 66 F.4th at 833 ("Mr. Valdez's opposition to summary judgment stated that 'either Defendant Motyka or Macdonald' fired the bullet that struck his finger, but he failed to point to any evidence that would have allowed a reasonable jury to find that Lieutenant Macdonald caused that injury.  The district court thus did not err in finding the record on causation was 'too

24

speculative' to present to the jury, and summary judgment was appropriate." (internal citation omitted)).

### 2. Municipal Agent

Mr. Driscoll argues that, "even if it was a JeffCo officer who shot Mr. Driscoll, Denver is still liable for the policies they enacted and the approaches they direct to policing" the protest. Docket No. 223-1 at 44. Mr. Driscoll claims that, under *Monell*, a city can be liable for the actions of its agents. *Id.* at 41 (citing *Monell*, 436 U.S. at 694). He asserts that Jeffco officers were "engaged in policing the protests consistent with Denver's policies as set by Commander Phelan." *Id.* at 44. Mr. Driscoll maintains that, during the protest, Denver had a policy of not requiring dispersal orders before using force against protesters, that it approved indiscriminate firing into peaceful crowds of protesters, and that it used chemical munitions to move crowds of protesters. *Id.* He claims that mutual aid officers carried out Denver's "procedures and approaches" to managing the protest in order to accomplish goals set by Denver and articulated through Commander Phelan. *Id.*

The Court finds that Mr. Driscoll has failed to demonstrate that Denver can be held liable for the actions of Jeffco police officers. It is an undisputed fact that Denver's policy was to allow outside agencies to employ their own use of force policies, *id.* at 19, ¶ 37, and that Jeffco SWAT officers relied on their own standard protocols and made decisions regarding uses of force based on their own assessment of the circumstances. Docket No. 189 at 14, ¶ 96. Therefore, although Mr. Driscoll's response attributes many use-of-force policies to Denver, the only relevant Denver policy is its policy of allowing mutual aid partners to rely on their own protocols.

25

After establishing a municipal policy or custom, a plaintiff must demonstrate "a direct causal link between the policy or custom and the injury alleged." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (citation omitted). "To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770 (internal quotation and citation omitted). Mr. Driscoll produces no evidence regarding Jefferson County's policies and procedures for law enforcement officers. There is no evidence that Jefferson County's policies were unconstitutional or would have led Jefferson County police officers to use unconstitutional force. There is also no evidence regarding what information Denver had about Jefferson County's use of force policies and no evidence that Denver knew that allowing Jefferson County police officers to use their own policies would lead to constitutional violations. Therefore, Mr. Driscoll fails to demonstrate how Denver's policy of allowing mutual aid agencies to rely on their own policies was closely related to the alleged violation of Mr. Driscoll's constitutional rights or the proximate cause of his injuries. *See Cousik*, 2024 WL 896755, at *20 (granting Denver summary judgment because plaintiffs had presented no evidence that a Denver policy regarding body-worn cameras was the moving force behind the actions of police officers from the City of Aurora).

Moreover, Mr. Driscoll has not shown that Denver can be liable for Commander Phelan's instruction to Jeffco SWAT officers to stop the protesters from reaching the police administration building. *See* Docket No. 189 at 9, ¶ 48; Docket No. 223-1 at 22, ¶ 66. "A single act of an employee may be imposed on a local governmental entity if the employee possesses final authority to establish policy with respect to the challenged

action." *Marshall v. Dix*, 640 F. Supp. 3d 1033, 1068 (D. Colo. 2022) (quoting *Ireland v.*
*Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1226 (D. Colo. 2002)) ("If an
official, who possesses final policymaking authority in a certain area, makes a decision
– even if it is specific to a particular situation – that decision constitutes municipal policy
for § 1983 purposes." (quoting *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir.
1995)).  However, as the Supreme Court has explained, "[t]o the extent that we have
recognized a cause of action under § 1983 based on a single decision attributable to a
municipality, we have done so only where the evidence that the municipality had acted
and that the plaintiff had suffered a deprivation of federal rights also proved fault and
causation."  *Brown*, 520 U.S. at 405.  The "act must reflect an intentional, deliberate,
decision by a final policy-maker and, where the act or omission of the final policy-maker
personally did not directly cause the violation of a constitutional right, only decisions of
the final municipal policy-maker which constitute a conscious disregard for a high risk of
unconstitutional conduct by others can give rise to municipal liability."  *Aguiar v.*
*Whiteley*, 2016 WL 502199, at *11 (W.D. Tex. Feb. 8, 2016) (citing *Brown*, 520 U.S. at
404–05).

    First, it is an undisputed fact that Commander Phelan did not order any use of
force at 13th Street and Cherokee Street after 10:00 p.m. on May 31, 2020.  Docket No.
189 at 10, ¶ 51.  Second, without identifying any applicable Jefferson County policy or
other incidents wherein Jeffco SWAT officers violated protesters' constitutional rights,
Mr. Driscoll provides no evidence that Commander Phelan knew or reasonably should
have known that directing Jeffco SWAT officers to stop the protesters approaching the
police administration building would cause these officers to deprive Mr. Driscoll or other

protesters of their constitutional rights.  *See Schneider*, 717 F.3d at 780 (finding

municipality not liable because plaintiff presented insufficient evidence to demonstrate

that employees with final decision-making authority knew or should have known that

their action would result in a deprivation of rights).

 Because Mr. Driscoll fails to produce sufficient evidence from which a jury could

reasonably conclude either that a Denver police officer shot Mr. Driscoll or that a

Denver policy was the proximate cause of a Jeffco SWAT officer shooting Mr. Driscoll,

Mr. Driscoll has failed to establish the causation element of his § 1983 claims.

Therefore, the Court will grant Denver's motion for summary judgment.[20]

## IV. CONCLUSION

 Therefore, it is

 **ORDERED** that the Motion for Reconsideration of Order Dismissing Failure to

Train Claims Against Defendant Denver [Docket No. 234] is **DENIED**.  It is further

 **ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 189] is

**GRANTED**.  It is further

---

[20] The Court notes that Mr. Driscoll's arguments regarding claim preclusion in his response to the motion for summary judgment do not alter the Court's analysis.  *See* Docket No. 223-1 at 25–26.  Even if the Court were to accept his arguments, Mr. Driscoll would still be required to prove causation in this case.  *See Cousik*, 2024 WL 4929272, at *7 (Plaintiffs "will not be required to prove at trial (a) a failure to train with respect to crowd management or the use of less-lethal weapons or (b) that Denver was deliberately indifferent to this lack of training.  Plaintiffs will still be required to prove (c) that each individual Plaintiff's constitutional rights were violated by Denver officers; and (d) Denver's conduct caused the violation of each individual Plaintiff's constitutional rights.").  Mr. Driscoll has failed to produce sufficient evidence of causation to defeat Denver's motion for summary judgment.

**ORDERED** that Defendant's Partial Motion to Exclude Expert Testimony of Edward R. Maguire Pursuant to Fed. R. Evid. 702 [Docket No. 200] is **DENIED as moot**.  It is further

**ORDERED** that plaintiff's claims against Denver are **DISMISSED with prejudice**.  It is further

**ORDERED** that this case is closed.

DATED March 10, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge